115 N.J. Super. 42 (1971)
278 A.2d 206
IN THE MATTER OF: JERSEY CITY EDUCATION ASSOCIATION, LOUIS T. SCIALLI, THOMAS FAVIA, SARAH GROCHOW, GAIL ROMANOWSKI, DORIS E. FILLIPPONE, ETHEL P. BROWN, DANIEL CUPO, GAIL HALL, BARBARA SCHNEIDER, AND ROBERT ROGENSTEIN, INDIVIDUALLY AND AS OFFICERS AND MEMBERS OF THE EXECUTIVE BOARD OF THE JERSEY CITY EDUCATION ASSOCIATION, AND FRANK AMARATO, JAMES AUMACK, MARY DAVIS, MARGARET DEL PRETE, DIANNE FERRARA, BERNICE MACCHIA, NEIL PAGANO, MICHAEL WARJANKA, MAE McCOMB, MYRA DANIELL, CHARGED WITH CONTEMPT OF COURT, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 22, 1971.
Supplementary Briefs Submitted March 31, 1971.
April 14, 1971.
Decided May 21, 1971.
*45 Before Judges CONFORD, KOLOVSKY and CARTON.
Mr. Emil Oxfeld argued the cause for appellants (Mr. Philip Feintuch, attorney).
Mr. Norman L. Kline, Assistant Prosecutor, argued the cause for respondent (Mr. Geoffrey Gaulkin, Hudson County Prosecutor, attorney).
The opinion of the court was delivered by CARTON, J.A.D.
In these consolidated appeals the Jersey City Education Association (Association) and 20 individual member teachers challenge the validity of summary convictions for contempt of court for violating a restraining order of the Chancery Division issued February 9, 1970 prohibiting them from engaging in a strike against the Jersey City Board of Education (board).
All defendants argue that the injunctive order was unconstitutionally issued. One group of defendants, comprised of officers and members of the executive committee of the Association, argue that the proofs fail to establish their violation of the order. The second group, consisting of members at large, although making no claim that their acts were not violative of the order, argue that actual notice of the February 9 restraining order was not established against them. The Association advances the additional argument that the amount of the fine levied against it was in excess of that constitutionally permissible as punishment for summary contempt.
*46 A summary of the chronological background leading to the strike and the proceedings which arose from it shed light on the legal issues involved.
Negotiations between representatives of the board and the Association began about December 1, 1969, the teachers having submitted their original proposals to the board late in October or early November. Some ten meetings of the parties took place thereafter  the negotiations principally concerning the issue of salary.
On January 15, 1970 Mayor Whelan of Jersey City delivered what was designated as the "State of the City Address" in which he set forth the problems the city faced in financing public education and related services. He indicated that the schools would be closed the following September unless financial assistance from the State was forthcoming. The next day the board published the proposed school budget limiting the teacher salary increase to $100 across the board.
An impasse in negotiations between the board and the teachers was reached on January 16, 1970, due in large measure to the board's statement that the $100 increase was the final offer and also because of a failure to agree on issues concerning size of classes, a proposed study of a mental health class, drug abuse and various special courses. When a mediator's efforts to resolve the dispute were unsuccessful, the State Public Employees' Relations Commission sent a list of names of fact-finders to the board which indicated acceptance of this list in early February.
After various meetings of the parties in which the Association unsuccessfully sought to have the board of school estimate defer adoption of the proposed budget until the issues in dispute were resolved, and while the fact-finding group remained in session, the members of the Association voted on Sunday afternoon, February 8, to strike. Negotiations with the fact-finding group immediately broke off when Scialli, president of the Association, returned from the meeting and announced that the teachers had voted to strike.
*47 The following day (Monday, February 9) the board filed a complaint alleging in essence that defendant Association and the group consisting of Louis T. Scialli, president; Thomas Favia, first vice-president; Marion Winds, second vice-president; Sarah Grochow, financial secretary; Gail Romanowski, corresponding secretary; Doris Fillippone, recording secretary; and Ethel P. Brown, Daniel Cupo, Gail Hall, Robert Rogenstein and Barbara Schneider, members at large of the executive board, advocated and called a strike by the public school teachers of Jersey City. On the basis of defendants' concession that as of February 9, 1970 such a strike existed, Judge Lynch that day entered a temporary restraining order until further order of the court and an order to show cause why an injunctive order should not be entered.
The restraining order was addressed to defendant Association and the individual defendants, "their associates, their servants, agents or employees or any individual acting in concert with or in combination with them." It restrained them
a. From picketing about, near or on schools or school grounds or areas about the public schools of the City of Jersey City.
b. From striking, participating in any strike, adjoining [sic], abetting, counselling, persuading any person or persons or any teacher or employee of the plaintiff to strike or to remain away from their work for the purpose of striking or from interferring with any person or persons, student or students desiring to enter the Public Schools of the City of Jesey City.
c. To refrain from any act which will in any manner disrupt the lawful and orderly conduct of the schools and the education of the public school children of the City of Jersey City or of interferring in any manner with the welfare and safety of the public school students. From ordering, commanding, directing, assisting, abetting, counselling, persuading or suffering in any manner whatsoever any person or persons who attempt to commit or who commit any of the aforesaid acts.
When issuing the restraining order the court announced that the merits of the dispute were not involved and that the court was taking such action because public employees *48 have no legal right to strike. The court also made it clear that the restraining order was an order of the court. Copies of the complaint and affidavits were directed to be served upon the named defendants. The board was also directed to publish the order in a prominent manner on February 10 "by way of display advertising" in the Hudson Dispatch and Jersey Journal.
On February 10 each named defendant was served with the February 9 restraining order. On February 11, on the basis of affidavits that alleged that each of these individual defendants continued his strike tactics and absented himself without excuse or authority from school; that none of them was ill on that day, having attended a meeting of the board of school estimate that morning, and that a number of pickets were stationed in front of various Jersey City schools after service and publication of the order, Judge Lynch issued an order of arrest charging these defendants with violating the restraining order. After presenting themselves to the court voluntarily, they were released on their own bond of $1,000 each.
On the following February 19 the second group of defendants, comprised of ten teachers of Public School No. 12, were ordered to be arrested for the violation on Friday, February 13, of the February 9 restraining order. These defendants were also released on bail of $1,000. This second group of defendants is comprised of the following teachers: Frank Amarato, James Aumack, Mary Davis, Margaret Del Prete, Dianne Ferrara, Bernice Macchia, Neil Pagnano, Michael Warjanka, Mae McComb and Myra Daniell.
A consolidated summary trial of all defendants for contempt of court was conducted by Judge Lora in which Lawrence P. Brady, Esq. was designated to prosecute the contempts. The prosecution offered considerable evidence, which will be referred to hereafter, in support of the charges. The defense recalled one of the State's witnesses concerning an article appearing in the newspaper but offered no other evidence. None of the defendants testified. It was conceded *49 that the individual defendants of the first group, whether in their respective capacity or individually, as well as defendants New Jersey Education Association and Jersey City Education Association, were properly served on February 10 with the order to show cause, the complaint and the temporary restraining order.
After the prosecution rested its case, Judge Lora granted motions for acquittal as to defendants Gould and New Jersey Education Association. He also granted a dismissal as to defendant Marion Winds, a vice-president of the Jersey City Education Association, at the conclusion of the case. He found all other defendants guilty of violating the restraining order.
The officers and members of the executive board of the Teachers' Association were sentenced to three months in county jail, two months suspended, fined $500 each and placed on probation for one year. The second group of defendants, with the exception of Frank Amarato, was sentenced to 30 days in county jail, 20 days suspended, fined $200 each and placed on probation for one year. Amarato was sentenced to 30 days in county jail, 15 days suspended, fined $250 and placed on probation for one year. Defendant Jersey City Teachers Association was fined $10,000.

I
All defendants contend that the February 9, 1970 restraining order was issued contrary to the provisions of the New Jersey Constitution.
We overlook the fact that the validity of a restraining order is justiciable only on appeal from the order and not from an adjudication for contempt thereof. In re Tiene, 17 N.J. 170 (1954). On the merits of the question presented, the law is contrary to defendants' assertion. Delaware River and Bay Authority v. International Organization, etc., 45 N.J. 138 (1965); Board of Education, Union Beach v. N.J.E.A., 53 N.J. 29 (1968); In re Block, 50 N.J. 494 (1967); In re Buehrer, 50 N.J. 501 (1967). Any suggestion *50 that this conclusion should be re-examined in light of the right to "organize" should be addressed to the Supreme Court.

II
Defendants next argue that there was no proof beyond a reasonable doubt that there were knowing violations of the restraining order.
As to the first (Scialli) group, notice of the restraining order is not in issue. These defendants, all officers, or members of the executive board of the Association, contend only that there is no proof that absence from school was pursuant to a strike plan or other concerted activity. They also argue that the attendance records of defendants were improperly admitted. Defense counsel stipulated as to what the contents of the attendance books were, but refused to stipulate the meaning of the symbols used in them or any conclusions to be gleaned therefrom.
Francis McCarthy, assistant superintendent in charge of personnel, testified as to the existence of a standard operating procedure requiring all teachers to sign or report in. On the basis of this procedure, records were maintained of teachers present or absent.
Principals of individual schools kept daily information sheets showing actual attendance and absences. This information was consolidated in a summary report prepared under McCarthy's supervision. The attendance records established that all individual defendants of both groups (with some exceptions as to certain individual dates) were generally absent from February 9 to March 3 without explanation or excuse. He testified, further, that although the Jersey City school system had a teaching staff of 1743 and the normal absence rate was no more than 10%, during the period from February 9 to March 3 the total teachers present on any one school day ranged between 288 and 400. During this period all schools were open each school day, but closed shortly after 9 A.M. due to teacher absences.
*51 We are satisfied that the attendance records were properly admitted into evidence and that they warrant the inference that all individual defendants absented themselves from school pursuant to the strike activity. Simply because these particular defendants may have been at the board of estimate meeting on February 11 and engaged in some form of negotiation, did not relieve them of their obligation of performing their duties as teachers or alternatively of reporting an expected absence to the appropriate authorities.
Such evidence of absence from school without excuse or explanation in violation of school regulation, coupled with all the other evidence, including the fact that a union strike was in progress and that these defendants occupied executive positions in the Association whose members voted the strike, established beyond question that all of these individual defendants, as well as the Association of which they were officers, were participating directly or indirectly in the strike, and aiding and abetting it in violation of the restraining order.
As to the second group, the teachers of P.S. 12 who were charged with violating the restraining order on February 13, the primary issue is the adequacy of notice.
One cannot be found guilty of contempt of a labor injunction unless it is shown that he acted with knowledge of the injunction. However, it is not necessary to prove formal service on the individual. Actual notice of its existence and its contents is sufficient. Although actual knowledge must be established, it may be inferable from the facts. See Garrigan v. United States, 163 F. 16 (7 Cir.1908), cert. denied 214 U.S. 514, 29 S.Ct. 696, 53 L.Ed. 1063 (1909). See also, 51B C.J.S. Labor Relations § 988; Annotation, "Contempt  Injunction  Nonparty," 15 A.L.R. 386, 400 (1921); 48 Am. Jur.2d, Labor and Labor Relations, § 1527.
The question before us is whether the record is sufficient to justify the conclusion beyond a reasonable doubt that these teachers acted with knowledge of the restraining order. We are satisfied that it does.
*52 Knowledge may be inferred from the circumstances surrounding the violation of the order. From the stipulation of counsel it appears that these defendants were members of the union. Their representatives had been negotiating with representatives of the board for many weeks prior to the calling of the actual strike on February 8. The restraint was issued on February 9 (Monday). The proofs showed that there was wide dissemination of news of the strike and of the order restraining it, and that the order was published in its entirety in full-page displays in both the Hudson Dispatch and the Jersey Journal, the principal local dailies circulated in Jersey City. General news reports of the strike continued throughout the week of February 9.
Julia Barnes, principal of P.S. 12, testified that on February 13 several of these defendants, not particularly identified, came into her office and left self-addressed envelopes so that their paychecks could be mailed to them. She observed all of the defendants in this group standing or walking around in front of the entrance of that school from about 8:15 A.M. to 8:40 A.M. on that same day and testified that they did not report that day for the purpose of teaching. Although she did not see any of these defendants actually carrying a sign that day, she described their activity as picketing.
The inescapable inference from all the circumstances is that these defendants were not only aware of the strike but that they were also familar with the existence and contents of the court order whose proscriptive terms extended to all members of the union. These defendants, as teachers and members of the striking Association, had a strong economic stake in the outcome of the lengthy negotiations which led up to the strike. There was wide dissemination in the news media of the strike and specifically of the general tenor of the restraining order. There is no reasonable doubt that these defendants had actual notice that they were restrained from striking, or aiding or abetting in the strike in any way.
*53 Finally, in the exercise of our appellate function we concur with the penalty as imposed against each individual defendant.

III
Defendant Association advances the further contention that the $10,000 fine levied against it exceeds that authorized by law in a summary criminal contempt proceeding such as this. The principal basis for this contention is that the Legislature, in adopting N.J.S.A. 2A:169-4, "has clearly specified the maximum penalty which may be assessed in non-indictable and non-jury cases as being six months in jail or by a fine of not more than $500." That section, as it was amended in 1968, reads:
Except as otherwise expressly provided, a person adjudged a disorderly person shall be deemed to have been guilty of a petty offense and shall be punished by imprisonment in the county workhouse, penitentiary or jail for not more than six months or by a fine of not more than $500 or both. [L. 1968, c. 113, § 1]
It should be noted that this provision does not purport to prescribe the punishment for all petty offenses. It is simply an amendment to the general punishment section of the Disorderly Persons Act. Adopted in response to the holding of the United States Supreme Court in Duncan v. Louisiana, 391 U.S. 145, 194, 88 S.Ct. 1444, 20 L.Ed.2d 491, 522 (1968), its apparent purpose is to insure that all disorderly persons offenses may be tried by the court without a jury.
The other sections of the act list the various offenses prohibited under the category of disorderly persons. Contempt of court is not among those listed. Nor does the Disorderly Persons Act refer to contempt of court regarding the punishment which may properly be imposed for the commission of that offense. The effect of N.J.S.A. 2A:169-4 is merely to prescribe the limits of punishment for the petty offense of being a disorderly person.
*54 Compare the inclusive language of N.J.S.A. 2A:85-1, which provides "all other offenses of an indictable nature at common law, and not otherwise expressly provided for by statute, are misdemeanors"; see, too, N.J.S.A. 2A:10-1 which, after defining what constitutes contempt of court, contains this proviso: "Nothing contained in this section shall be deemed to affect the inherent jurisdiction of the superior court to punish for contempt."
Consequently, we do not interpret N.J.S.A. 2A:169-4 as expressive of a legislative intention to limit or specify the maximum penalty which could be imposed for all petty offenses and particularly contempt of court. Nor do we read In re Buehrer, 50 N.J. 501 (1967), as adjudicating that summary contempt constitutes a disorderly persons offense. The following language of the Buehrer opinion does not mandate the conclusion urged by defendants:
We have not passed upon the outer limits of punishment with respect to the offenses below the grade of crime. As stated above, the Legislature authorized a year's imprisonment and a fine of $1,000 for a disorderly persons offense. The amount of the fine presents no problem. Whether a jail term for a year exceeds constitutional limits may be debatable. No case in our State has dealt with that question. An authorized maximum of six months has been upheld. * * * (emphasis added) [at 519].
In view of our conclusion that the Disorderly Persons Act does not apply to contempts of court, we need not consider the State's further argument that the term "person" as used in that statute refers only to persons individually and was not intended to protect corporations or organizations of persons. Cf. Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), which considers whether a corporation must be treated as a person and entitled to due process of law and equal protection.
We also do not read the Buehrer case to set the outer limits of punishment for all summary contempt convictions. Buehrer involved individuals, not a corporation. The decision *55 represents a limitation on the inherent jurisdiction of the court in assessing the maximum penalty for a violator subject to both a fine and a term of imprisonment. The court was concerned not with the amount of the fine ("The amount of the fine presents no problem," at 519), but with the possible duration of the prison term.
We are not persuaded that Buehrer intended to fix the maximum fine in situations where imprisonment was impossible or to hold that a fine in excess of the $1,000 imposed on some defendants in that case may not be assessed against a corporate defendant because it would violate the concept of the "petty offense" limitation.
The line of demarcation between "petty offense" and "criminal prosecution" has been equated with the right of trial by jury. See Frank v. United States, 395 U.S. 147, 148, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969). Under Bloom v. Illinois, 391 U.S. 194, 198, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968), contempt of court must be denominated a petty offense unless the punishment makes it a serious offense.
We observe that the federal statutes do not fix the limits (except in certain cases) for punishment for contempt, nor do they distinguish between those contempts which should be classified as petty or serious. In considering the problem the federal courts have adopted a hindsight approach as the criterion.
Where no maximum penalty is authorized, the severity of the penalty actually imposed is the best indication of the seriousness of the particular offense. [Frank v. U.S., supra at 149, 89 S.Ct. at 1505]
Both Bloom and Frank considered the consequences of a jail sentence in contempt cases. In Bloom a sentence of two years imprisonment for contempt after trial without a jury was held to be a "serious" offense  requiring a trial by jury. In contrast, Frank upheld a conviction after trial without a jury as being a petty offense where defendant was *56 given a suspended sentence and placed on probation for three years.
In Rankin v. Shanker, 23 N.Y.2d 111, 295 N.Y.S.2d 625, 242 N.E.2d 802 (Ct. App. 1968), the court considered whether a fine of $10,000 per day or 1/52 of the total amount of annual membership dues "whichever is the lesser" (provisions setting this penalty are contained in the Taylor Law  Jud. Law § 751, subd. 2, par. [a]), render the contempt a "serious" crime within the meaning of Bloom v. Illinois, supra.
* * * The determination, whether it is serious or petty under the decisions, turns not on the amount of the fine which may be imposed but solely on the length of the prison sentence. (See Ex parte Wilson, 114 U.S. 417, 428, 5 S.Ct. 935, 29 L.Ed. 89; People v. Bellinger, 269 N.Y. 265, 271, 199 N.E. 213, 216; Matter of McKinney v. Hamilton, 282 N.Y. 393, 397, 26 N.E.2d 949, 951, 127 A.L.R. 1283). Consequently, as the cases reveal, the fine, even though sizeable in amount, furnishes no valid criterion for the defendants' claim that the contempt charged against them constitutes a serious crime. Further, even if the amount of the permissible fine had any relevance, the fine  which in the last analysis must be borne by the union membership (see e.g., Martin v. Curran, 303 N.Y. 276, 281, 101 N.E.2d 683, 686)  is actually small, amounting, at most, to no more than a member's weekly union dues for each day of the contempt. [295 N.Y.S.2d at 632, 242 N.E.2d at 807-808]
We note also that in United States v. United Mine Workers of America, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1946), the court held that the union had no right to a trial by jury despite a fine of $700,000 (reduced by the court from $3 1/2 million). However, the "right to trial by jury" was argued in terms of the right as granted under § 11 of the Norris-LaGuardia Act and not under the equal protection or due process clauses. The Supreme Court concluded the corporate defendant was properly tried without a jury.
The court in Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966), denied Holland Furnace's petition for certiorari (381 U.S. 924, 85 S.Ct. 1559, 14 L.Ed.2d 683 (1965)) despite a $100,000 fine after trial without *57 a jury, but granted Cheff's individual petition arising from that same action so as to determine if he had been denied his right to a jury trial. Cheff had been sentenced to six months imprisonment. The court upheld his conviction.
In its latest pronouncement, the Supreme Court has held that "no offense can be deemed `petty' for purposes of the right to trial by jury where imprisonment for more than six months is authorized." Baldwin v. New York, 399 U.S. 66, 69, 90 S.Ct. 1886, 1888, 26 L.Ed.2d 437, 440 (1970).
Our research has disclosed no case holding that a conviction which could result only in the imposition of a money fine, regardless of amount, and not in imprisonment, gives rise to a right to a jury trial  or makes a "petty" offense a "serious" one.
Since Buehrer, as Judge Lora observed, "was concerned only with the question of the permissible limits of non-jury proceedings and punishment of individuals, and not of a union or association such as here involved," we are not bound by the limitation prescribed in that case. We have already noted that there exists no limitation of a legislative nature.
Unlike union officers, the union itself cannot be jailed for contempt. On the other hand, the citation of all striking members individually and the invocation of plenary proceedings as to each present an impracticable alternative method of vindicating the public wrong committed by willful defiance of the order. We observe also that the sting of a $500 or $1,000 maximum fine even on a daily basis, would not, in all probability, serve as a deterrent to a large union calling a strike of public employees.
We are of the opinion that corporations are sufficiently dissimilar to individuals to warrant the imposition of a fine exceeding $1,000 in a summary contempt proceeding. A greater fine does not transform the contempt from a petty to a serious offense and would not require the incidents of indictment and trial by jury. Consequently, a *58 fine, limited only by reasonableness, may be imposed against a corporate defendant in a summary contempt proceeding. The fine imposed against defendant Association by the trial court was a proper one under the circumstances of this case. We concur in that sentence.
All pending stays are vacated. Fines are to be paid forthwith, if not already paid. Jail terms shall be served commencing July 12, 1971.
Affirmed.