**365 A.2d 499.**

The School Committee of the City of Pawtucket *vs.* Pawtucket Teachers' Alliance, Local No. 930 *et al.*

NOVEMBER 9, 1976.

PRESENT: Bevilacqua, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

PAOLINO, J. This is a public school teachers' strike case. The defendants are appealing from the issuance of a preliminary injunction by a justice of the Superior Court enjoining their strike and from a contempt order issued by another justice of that court for violation of that injunction. The plaintiff herein is the School Committee of the

City of Pawtucket (hereinafter school committee). The defendants are the Pawtucket Teachers' Alliance, Local No. 930, American Federation of Teachers, AFL-CIO, its officers and all of its members (hereinafter alliance). For convenience we shall treat the appeals separately.

### Preliminary Injunction

The alliance and the school committee had been engaged in continuous unsuccessful contract negotiations for the 1975-76 school year from December 1974 to September 1975. On the day before the Pawtucket public schools were scheduled to open, September 1, 1975, with the parties still at an impasse in their contract negotiations, the alliance membership voted to take a "no contract, no work" position and so notified the school committee by telegram. Opening day arrived but no contract had been signed. On that day all but a few of the 652 teachers failed to report for work and some engaged in picketing.

The next day the school committee filed a complaint in the Superior Court alleging, among other things, that unless the work stoppage was enjoined, the approximately 11,000 Pawtucket school children would suffer irreparable injury. Hearings were held on September 8 and 10, 1975, before a justice of the Superior Court. The chairman of the school committee, Daniel V. McKinnon, testified that the school committee had acted in good faith and had made every effort to resolve the dispute but that he saw no reasonable prospect for imminent resolution. The Superintendent of Schools, Charles E. Shea, Jr., also testified. He agreed with McKinnon that negotiations seemed hopelessly deadlocked. He testified further that the schoolchildren were suffering from the very first day of the work stoppage. In defense, the alliance presented seven witnesses, all of whom are educators. These witnesses testified to the effect that this strike had not and would not cause irreparable harm. None of them, however, were able or will-

ing to express an opinion on exactly how long the strike would have to continue before it would constitute irreparable harm.

At the conclusion of the hearings, the court made factual findings that the teachers were engaged in an illegal strike which would continue if not enjoined, that the strike was causing irreparable harm, and that the school committee had more than a reasonable probability of prevailing in a final hearing. Based upon these findings the court granted the preliminary injunction and enjoined the alliance and all of its members from engaging in any work stoppage.

The first argument of the alliance is that the trial justice issued the injunction solely because he found the strike to be illegal. This, the alliance contends, is in violation of the rule established in *School Comm.* v. *Westerly Teachers Ass'n,* 111 R.I. 96, 299 A.2d 441 (1973), that concerted work stoppages by public school teachers are not subject to automatic restraining orders.

The injunction did not issue automatically in this case. We fail to see, therefore, how the trial justice deviated from the holding in *School Comm.* v. *Westerly Teachers Ass'n, supra.*

The opinion in that case holds that restraining orders will not issue ex parte to enjoin work stoppages by public school teachers. *Id.* at 103, 104, 299 A.2d at 445, 446. Normally, before an interlocutory injunction is issued in such cases, an adversary hearing should be conducted so that the court may "review what has gone on between the disputants." *Id.* at 104, 299 A.2d at 446. In order for an injunction to issue, the moving party must demonstrate that rights in question will be irreparably injured or endangered if the injunction is not issued; furthermore, the movant must present a prima facie case showing at least a reasonable probability of ultimate success in a final hearing. *Coolbeth* v. *Berberian,* 112 R.I. 558, 564, 566, 313 A.2d

656, 659, 660 (1974). Upon such a showing the trial justice shall exercise his sound judicial discretion and determine if the injunction should issue and if so, on what terms and for what period of time. *School Comm.* v. *Westerly Teachers Ass'n, supra* at 104, 299 A.2d at 445.

In this case the trial justice conducted the requisite hearing, considered what went on between the disputants, and enjoined the strike. This ruling was made after a finding that the strike was causing irreparable harm, that it would continue unless enjoined, and that the school committee had a reasonable certainty of prevailing in a final hearing. No abuse of discretion is evident. The injunction did not issue, as the alliance maintains, solely because the strike was found to be illegal.

The alliance next argues that the trial justice failed to follow the procedure set forth in the *Westerly* case because, it argues, that he did not consider whether the parties negotiated in good faith or bad faith. We need not address ourselves to this argument, however, since the question of bad faith negotiations by the school committee was never raised in this case. Our review of the record indicates that the trial justice never made any specific ruling excluding such evidence; no evidence of bad faith negotiations[1] was introduced either by direct evidence or by an offer of proof.

The final argument made by the alliance with respect to the preliminary injunction is that the school committee failed to meet its obligation of demonstrating that the work stoppage was causing irreparable injury. The trial

---

[1]The Legislature has provided a remedy where either the teachers or the school committee feels that the other is not fulfilling its statutory obligation "to meet and confer in good faith." General Laws 1956 (1968 Reenactment) §28-9.3-4. That section of the General Laws permits recourse to the State Labor Relations Board which is empowered under §28-7-22 to issue appropriate orders to quell the bad faith bargaining.

justice heard competent evidence from the superintendent of schools that the strike was causing irreparable injury. This testimony was believed by the trial justice and it supports his finding. What constitutes irreparable harm is generally a factual determination made after considering the particular circumstances of a case. 7 Moore, *Federal Practice* ¶65.04[1] n.7c at 65-42—65-43 (2d ed. 1975). We will not, as a matter of law, hold that the finding of the trial justice was clearly wrong.

## Contempt Proceedings

Notwithstanding the court's order that the work stoppage be enjoined[2] and a general announcement that the Pawtucket schools would begin on the next day, the alliance members did not return to work. The school committee moved to have defendants adjudged in contempt for violation of the injunction and a hearing was held in the Superior Court on September 16, 1975.

Evidence was introduced at the hearing that the president of the alliance, John P. Kaveny, held a televised press conference on September 11, 1975 at a temporary headquarters for the alliance in South Attleboro, Massachusetts. At the interview the alliance's principle of "no contract, no work" was expressed. Notwithstanding the communication of that motto, alliance members testified that their decision not to return to work was individual and that there had been no urging of members to disobey the preliminary injunction nor, indeed, any discussion among members of whether to return to work or not.

---

[2]The order granting the preliminary injunction states that

"\* \* \* the plaintiffs' prayer for a preliminary injunction be and hereby is granted and until further order of this Court, defendants, the Pawtucket Teachers' Alliance, and each and every member thereof, are hereby enjoined from and after September 10, 1975, from engaging in any work stoppage or strike in the City of Pawtucket school system."

In his conduct of the hearings and in his findings, the trial justice made it clear that he believed the preliminary injunction imposed on the alliance leadership an affirmative duty to take steps through their organization to bring an end to the work stoppage and to withdraw the "no contract, no work" policy. At the conclusion of the hearing, the trial justice found as a fact that all but four of the teachers failed to report for work after the preliminary injunction had issued, that no affirmative action to halt the strike had been taken by the alliance, and that defendants were engaged in "concerted activity" to continue the work stoppage in violation of the preliminary injuncion. Upon these findings the court exercised its coercive powers imprisoning alliance officers and members of the alliance negotiating committee until they were willing to comply with the preliminary injunction and imposing fines upon members for each day of absence from work.[3]

The alliance's argument urging reversal of the contempt order is that the preliminary injunction did not order the alliance to take affirmative steps to halt the work stoppage and that therefore it was error for the justice presiding at the contempt hearing to hold the alliance in contempt because its leadership took no such positive action.

To be enforceable by contempt proceedings an injunction should be clear and certain and its terms should be sufficient to enable one reading the order to know exactly what he must do or refrain from doing. *Sunbeam Corp.* v. *Ross-Simons, Inc.*, 86 R.I. 189, 194, 134 A.2d 160, 162-63 (1957). If the trial justice's decision was based solely on

[3]On September 25, 1975, the Presiding Justice of the Superior Court issued an order whereby he vacated that portion of the contempt order imposing fines upon union members for each day of noncompliance. Consequently, we do not deem it necessary to consider the question of the validity of such fines. The September 25th order did not, however, vacate or otherwise amend the original finding that certain individual members were in contempt of court.

a finding that there was no action taken on the part of the alliance to have its members go back on the job, then we would sustain the appeal since we agree that the preliminary injunction did not specifically require such affirmative action. The finding of no positive action was not, however, the only basis for holding the alliance to be in violation of the preliminary injunction. It was evident to the trial justice that the work stoppage was not curtailed by the preliminary injunction. He did not accept as truthful the testimony that the members did not confer with one another after issuance of the preliminary injunction, and that the decision not to return to work was made by each teacher individually.[4] *See Gorman* v. *Hand Brewing Co.*, 28 R.I. 180, 66 A. 209 (1907). In addition to finding the teachers' exculpatory testimony improbable and untrue, competent evidence supported the finding of concerted activity. The clearest example of signalling that the strike was to continue regardless of the preliminary injunction was the news conference where the "no contract, no work" principle was restated; the fact that the alliance officers refused to return to work was further evidence of signalling to the membership that the strike was to continue in spite of the preliminary injunction.

The holding is supported by competent evidence and no abuse of discretion in the exercise of the court's coercive powers is apparent from the record. We cannot, however,

---

[4]Other courts considering motions to adjudge in contempt for failure to heed antistrike injunctions have heard testimony that the absences were the result of individual decisions or were coincidental. In one of the leading cases, *United States* v. *International Union, United Mine Workers of America*, 77 F.Supp. 563, 566-67 (D.D.C. 1948), *aff'd*, 177 F.2d 29, *cert. denied*, 388 U.S. 871, 70 S.Ct. 140, 94 L.Ed. 535 (1949), the Court dismissed such testimony as "simply ridiculous." *See also Foam & Plastics Div. Chems., Inc.* v. *General Drivers & Helpers, Local 401*, 520 F.2d 945, 947 (3d Cir. 1975), and *In re Jersey City Educ. Ass'n*, 115 N.J. Super. 42, 278 A.2d 206 (1971).

abide by the entire contempt order as it has been presented to us. While it is clear that the injunction forbade every individual alliance member from engaging in a continued work stoppage, it is also evident that none of the class of individual members found to be in contempt had actual personal notice of the hearing at which evidence of such contempt was presented to the court. Before individual members of the alliance can be adjudged in contempt, each must be afforded notice of the proceedings and an opportunity to be heard. *Menard* v. *Woonsocket Teachers' Guild—AFT* 951, 117 R.I. 121, 363 A.2d 1349 (1976). It is apparent from the record before us that no such procedural safeguards were observed in the present case. For this reason we are constrained to vacate that portion of the contempt order[5] which found the members of the union who had had notice of the injunction to be in contempt of court.

The appeals of defendants Pawtucket Teachers' Alliance, Local No. 930, American Federation of Teachers, AFL-CIO, the named officers of said alliance and the named members of the negotiating committee of said alliance are denied and dismissed and the orders appealed from insofar as they apply to these defendants are affirmed.

The appeals of those individual defendants who received no notice of the contempt proceedings against them are sustained. Those portions of the orders appealed from which apply to these defendants are vacated. This cause is remanded to the Superior Court for further proceedings in accordance with this opinion.

Mr. Justice Kelleher, dissenting. I cannot agree with that portion of the majority's opinion which deals with the contempt finding. My disagreement is not new, since it first surfaced in mid-September 1975, when the defendants sought a stay in this court from the coercive portions

---

[5]See note 3.

of the contempt judgment while we considered their appeal. On September 18, 1975, an order was entered denying the request for a stay and bearing the dissent which expressed the views of myself and the late Chief Justice Thomas H. Roberts. Today, over a year has gone by, and after much reflection and study I can find no reason to modify the views I expressed in our 1975 order.

Individuals who are enjoined by a court, since they are under the threat of judicial punishment, are entitled to be told in clear, specific, and precise terms what is expected of them. They need not resort to inferences or implications to ascertain their duty or obligation. *Sunbeam Corp.* v. *Ross-Simons, Inc.*, 86 R.I. 189, 134 A.2d 160 (1957). The court's order must be complete and explicit in what it prohibits and what it directs. In fact, Super. R. Civ. P. 65(d), unlike its federal counterpart, specifically requires that every order granting an injunction shall be specific in its terms and shall describe in reasonable detail the act or acts sought to be restrained.

The injunction entered against the defendants on September 11, 1975, enjoined them "* * * from now and after September 10, 1975, from engaging in any work stoppage or strike in the City of Pawtucket school system." Six days later, the defendants who are now incarcerated appeared at the contempt hearing. As each of them testified, they were asked by the trial justice or plaintiffs' counsel if they had urged or planned to urge the members of the union to return to work. When this inquiry was first made, defense counsel contended that the preliminary injunction did not require any such action. The trial justice replied, "You don't think it did, I think it did."

As I read the terms of the injunction, it orders the union to end the strike and nowhere does it direct the union officers to exhort the rank and file to return to the classrooms.

I have no doubt that the union's officers might have

been jailed for their failure to return to work. However, after reviewing the record of the contempt proceedings, it is my ineluctable conclusion that those who were incarcerated were imprisoned solely because of their failure to speak to the union membership and advocate a return to the classrooms. The injunction contains no such mandate.

The contempt judgment contains a finding that the present controversy falls well within the holding of *United States* v. *United Mine Workers of America,* 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). A cursory look at the order entered in that particular case shows that it was far more explicit and detailed than the preliminary injunction that was entered in the Superior Court.

A court order should be obeyed. Obedience, however, cannot be demanded of something that is not specifically set forth in the order.

I am fully aware that work stoppages of public employees lead to litigation which is usually conducted in a pressure-packed atmosphere. In early September 1975 we were asked to review contempt adjudications relating to employees of the city of Pawtucket only to find, upon examination of the records, that no judgments had ever been entered in the Superior Court. *City of Pawtucket* v. *Council 70 AFSCME, Local 1012,* 115 R.I. 914, 344 A.2d 374 (1975). Here, in the case at bar, the order, which was entered at a time when tensions and public sentiment were high, falls far short of the requisite particularity called for by Rule 65(d) and the holding in the *Sunbeam* case. I would hope that if similar controversies arise in the future, the bench and the bar will take special pains to see to it that orders which can subject a citizen to being held in contempt are drawn up in such a manner so that there is no doubt as to the reach of the judicial mandate that must be obeyed. The rush and the anxiety to do something to get the public employees back on the job

is understandable, but I trust that we all may profit from what has transpired during the past year as governmental agencies have come to the courthouse to resolve a collective bargaining impasse.

*Higgins, Cavanagh & Cooney, Joseph V. Cavanagh,* for plaintiff.

*Abedon, Stanzler, Biener, Skolnik & Lipsey, Richard A. Skolnik,* for defendants.