**SCHOOL COMMITTEE OF the CITY OF PAWTUCKET**

v.

**PAWTUCKET TEACHERS ALLIANCE, LOCAL NO. 930 et al.**

No. 85–424–Appeal.

Supreme Court of Rhode Island.
June 6, 1986.

Stephen Robinson, Katherine Merolla, Asquith Merolla Anderson Ryan & Wiley, Providence, for plaintiff.

Richard A. Skolnik, Lipsey & Skolnik, Malcolm Najarian, Providence, for defendant.

## OPINION

KELLEHER, Justice.

Most Rhode Islanders have become accustomed to the likelihood that when the summer season comes to an end with the setting of the sun on Labor Day, a strike by the public school teachers in one of the state's municipalities or school districts will take place when the ringing of the school bells announces the opening of another school year. Last September was no exception, and when the school year began in the cities of Pawtucket and Newport, the teachers were on the picket line rather than in their classrooms. Our concern in this appeal is the Pawtucket strike. The record indicates that on the first day of school approximately 550 public school teachers embarked on a thirteen-day strike that ultimately resulted in the incarceration of fifty-three teachers after they and the teachers' union had been held in civil contempt for their failure to abide by a back-to-work order entered after a hearing by a Superior Court justice. The strike was settled when in the early-morning hours of September 20, 1985, a "weary" Governor Edward D. DiPrete emerged from his statehouse office to announce the end of a "nightmare."[1]

The parties have stipulated to the following facts. The collective-bargaining agreement between the parties to this controversy expired on August 31, 1985. Despite more than ten meetings prior to the expiration of the agreement, the parties' attempts to negotiate a new contract for the school year commencing in September of 1985 failed. Consequently, when the doors of the Pawtucket schools opened as scheduled on September 4 to welcome 8,000 students, only one teacher reported to work. The principle guiding the teachers and their union, the Pawtucket Teachers Alliance (the alliance), has been "No contract no work."

On the first day of the strike, the Pawtucket School Committee filed a complaint in Superior Court alleging that the alliance, its officers, and its members (the teachers) were engaged in an unlawful strike. The school committee sought injunctive relief prohibiting the alliance and the teachers from continuing their strike of the Pawtucket public schools.

Shortly after the hearings on the preliminary injunction commenced on September 9, the trial justice appointed the State Commissioner of Education as special master to develop facts with respect to prior negotiations. The master was directed by the trial justice to furnish the parties with a full opportunity to engage in good-faith negotiations and ordered the parties to attend all meetings scheduled by the master. The hearings continued for three days and, relying upon the testimony of a variety of witnesses presented by both parties, the report of the master and the stipulation, the trial justice made twenty-one findings

---

1. In its April 13, 1986 edition at page A–16, the Providence Sunday Journal classified the Pawtucket strike as the state's fifty-third teachers' strike since the enactment of the Michaelson Act, which gives the teachers the right to bargain on salary and working conditions and provides for binding arbitration over nonmonetary matters. The article also discussed various legislative proposals presently pending in the General Assembly, all of which have as their common goal the opening of all the public schools on the designated day. The proposals include one calling for binding arbitration on the so-called last best offer and another that not only recognizes the teachers' right to strike but also provides for a loss of pay for the days spent striking. State law requires a municipality to establish and maintain a school year containing at least 180 days exclusive of holidays. In a short strike, the no-school days are usually made up by reducing the number of preplanned vacation days. An extended strike may require the extension of the school year.

of fact and concluded that (1) the students were being irreparably harmed by the strike, (2) the only adequate remedy was injunctive relief, and (3) a substantial likelihood existed that the school committee would prevail at a hearing on a permanent injunction. Thus, on September 12 she issued a preliminary injunction restraining the alliance and its members "from further engaging in any work stoppage or strike * * * until further order of [the] Court."

The teachers did not return to the classrooms on Friday, September 13. On the following Monday the school committee filed a motion to adjudge the alliance and its members in contempt of the preliminary injunction and sought the issuance of contempt citations.

During the three days of hearings on the motions to adjudge defendants in civil contempt, fifty-three teachers were held in civil contempt[2] for violating the preliminary injunction. The teachers were to be incarcerated at the Adult Correctional Institutions (ACI) "until such time as they expressed a willingness to comply with the court order." A fine of $500 per day was imposed on each teacher for every day, beginning with the day they were adjudged in contempt, that they refused to comply with the September 12 order.

The alliance was also held in civil contempt for violating the injunction and was ordered to pay, after a hearing was conducted concerning its finances, a fine in the amount of $10,000 per day for each future day that it continued to violate the injunction.

As noted earlier, the differences between the parties were resolved in the statehouse on September 20, 1985, and the teachers were immediately released from confinement. Pawtucket's public schools opened, fully staffed, on September 23, 1985.

The teachers and their union have appealed both the issuance of the preliminary injunction and the trial justice's findings of

contempt. Although we are presented with a myriad of issues, we shall address only those that deserve consideration.

The teachers claim that they were not properly served with contempt citations and that because the service of process was defective, the resulting convictions of contempt and fines imposed are a nullity.

The trial justice ordered that the contempt citations be served in accordance with the special-order provisions of G.L. 1956 (1985 Reenactment) § 8-2-33. The order provided that the teachers named in the motion could be "served by regular mail and/or by posting a copy of the contempt citation on the door at the home address of each individual [teacher]." Each named teacher was served by a posting of a copy of the contempt citation on the door of his/her home address.

■ Although § 8-2-33 does not specifically provide for service by posting, this court is of the opinion that a Superior Court justice such as the trial justice in this litigation has the inherent power to fashion a special order of notice in a given case which is reasonably calculated to inform the subject of the notice of a scheduled hearing when the exigent circumstances indicate that the usual avenues of service would be of no avail. The present dispute, a highly publicized case, involved a large number of alleged contemnors whose unlawful strike was affecting approximately 8,000 Pawtucket students and their families. The situation required immediate action in an attempt to prevent further harm to the students and interference with the school calendar. Because of the substantial number of individuals charged with contempt and the exigent circumstances of the case, the trial justice's action in ordering the posting was well warranted.

The record is clear that each teacher who was ultimately held in contempt had actual notice of the contempt hearing, appeared at

2. The clearly coercive nature of the sanctions imposed belies defendants' contention that they were held in criminal contempt. *See School*

*Committee of Pawtucket v. Pawtucket Teachers Alliance, Local 930,* 101 R.I. 243, 255-57, 221 A.2d 806, 813-14 (1966).

the hearing, was represented by counsel, and testified that he/she would not return to work despite the court order requiring him/her to do so until he/she had a contract with the school committee. The teachers all freely admitted that they were violating the court order by not returning to the classroom and insisted they must continue to violate the order. The trial justice gave each of the teachers an opportunity to agree to comply with the order and to avoid the imposition of a fine and incarceration. However, each teacher politely refused to comply and steadfastly adhered to his/her position that he/she would not return to work without a contract.

Here, it is clear from an examination of the record that each of the teachers held in contempt of court had received notice of the proceedings and was given an opportunity to present arguments and evidence in his/her defense. *See Town of Lincoln v. Cournoyer*, 102 R.I. 512, 232 A.2d 124 (1967). *See also Menard v. Woonsocket Teachers' Guild-AFT 951*, 117 R.I. 121, 133, 363 A.2d 1349, 1356 (1976).

In its portion of this appeal, the alliance argues that the fine imposed upon it should be vacated because it was never notified of the contempt charges pending against it since the constable who was charged with the duty of posting apparently forgot to post a notice of the contempt citation on the door of the alliance's business office, which is situated at 1499 Newport Avenue in Pawtucket. However, the record is clear that a copy of the citations served upon the teachers was posted on the alliance's front door.

On September 17, 1985, the trial justice announced that the school committee's motion to adjudge the alliance in contempt would be heard the following morning immediately after the call of the calendar. The trial justice also announced the names of each of the alliance's seven officers who were to be brought from the ACI to the courthouse.

The next morning the alliance moved to dismiss the motion to adjudge it in contempt because it never received a citation or notice advising it of the contempt charges. In denying the motion, the trial justice stated that

"if the seven officers of the Alliance received notice that the School Committee was moving to adjudge them in contempt, it is the equivalent of the Alliance receiving notice. My preference would have been for [counsel] to have crossed all the T's and to have dotted all the I's, and clearly he didn't do it, but the basic impact of the notice that was received by each of the officers of the Alliance was sufficient to do what it is that notice is supposed to do, tell them where they have to be, what they have to be here on, and it's the Court's judgment that the motion to dismiss is not in order to be granted."

When the trial justice asked the alliance's counsel whether the alliance was seeking a postponement of the contempt hearing, counsel expressed the belief that "the matter is not in order for hearing this morning, because I believe that procedures were defective. Your Honor has ruled on that. We are prepared to proceed."

■ Thus, even assuming the union's lack of notice, counsel's announcement of readiness to proceed, in our opinion, constituted a waiver of any right to receive notice of the scheduled hearing on the contempt charges against the union, and any prejudice that might have resulted from the lack of notice was vitiated by the presence of counsel and his participation in the hearing. *See Quarto v. Quarto*, 440 A.2d 737, 738 (R.I. 1982).

The alliance's claim that it never violated the court order because the preliminary injunction did not require the alliance to take any affirmative action is the identical argument made to and rejected by this court on two prior occasions on similar facts. *See School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930*, 117 R.I. 203, 365 A.2d 499 (1976);

*Menard v. Woonsocket Teachers Guild-AFT 951*, 117 R.I. 121, 363 A.2d 1349 (1976).

 Although we concede that the express language of the preliminary injunction did not obligate the alliance to initiate any action to terminate the strike,[3] the trial justice's determination that the alliance violated the order prohibiting it from engaging in a work stoppage or strike was based on competent evidence and was not otherwise clearly wrong.

At the hearing on the motion to adjudge the alliance in contempt, the officers testified that they did not confer with one another or any of the membership after the injunction had been issued, but rather each individual made his/her own decision to remain away from work. The trial justice, however, rejected this testimony on credibility grounds and found that once the preliminary injunction had been entered, the alliance, through its officers, communicated the message to the membership that it would adhere to the long-standing principle of no contract, no work.

 It is clear that the trial justice was not bound to accept the officers' testimony as credible " 'merely because there [was] no direct testimony contradicting it, where it contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances in evidence, satisfy [the trier of fact] of its falsity.' " *Gorman v. Hand Brewing Co.*, 28 R.I. 180, 183, 66 A. 209, 211 (1907); *see also Woonsocket Teachers' Guild*, 117 R.I. at 131, 363 A.2d at 1355.

Competent circumstantial evidence, including a complete shutdown of the Pawtucket school system, contradicted the officers' testimony and served as the legal basis for the trial justice's finding that the alliance had indeed violated the court order. As noted by the trial justice and stated in *School Committee of Pawtucket*, 117 R.I.

at 210, 365 A.2d at 503, the fact that the officers of the alliance refused to comply with the injunction was telling evidence that the union, through its officers, had signaled its membership to continue the policy of no contract, no work, notwithstanding the issuance of the preliminary injunction. The display of union solidarity before the trial justice belies the alliance's claim that it and its membership during the period before, during, and after the strike were operating on completely different wavelengths.

The teachers' and the alliance's appeals are denied and dismissed, the judgments appealed from are affirmed, and the case is remanded to the Superior Court for further proceedings.

---

**3.** The trial justice expressed her belief that the injunction also required the alliance to advise the membership affirmatively that it had an obligation to go back to work. Because this oversight was not the sole basis of her decision that the alliance violated the order, it does not constitute reversible error.