MEMORANDUM AND ORDER
 

 TORRES, Chief Judge.
 

 Iris Rivera, individually and as the Ad-ministratrix of the Estate of Jennifer Rivera, brought this action against state prosecutors, the City of Providence (“the City”), and several Providence police officers. The plaintiff seeks money damages for the defendants’ alleged failure to protect her daughter, Jennifer, who was killed in order to prevent her from testifying in a murder case. The complaint contains claims brought pursuant to 42 U.S.C. § 1983 for alleged due process violations and claims brought under state law.
 

 With respect to the § 1983 claims, the City has moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c); former Providence Police Chief, Urbano Prignano, Jr., has moved for summary judgment pursuant to Fed R. Civ. P. Rule 56(c) and all of the other defendants have moved to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(6).
 
 [1]
 
 The State of Rhode Island (the “State”) has also moved to dismiss the state law claims.
 

 The threshold issue raised by all of the motions directed at the § 1983 claims is whether the allegations are sufficient to establish that the defendants deprived Jennifer of her constitutional right to due process. Because this Court finds that the defendants’ conduct did not amount to a constitutional violation, those motions are granted. Moreover, because the only remaining claims are state law claims, they are dismissed without prejudice to the plaintiffs right to assert them in a state court action.
 

 BACKGROUND
 

 This is a truly tragic case. The relevant facts alleged in the complaint are as follows. On August 28, 1999, Jennifer Rivera, a 15-year old girl, witnessed a murder committed behind her home. At the request of a Providence police officer, Jennifer signed a statement and, later, identi
 
 *CCXIX
 
 fied Charles Pona as someone that she saw running from the murder scene.
 

 A few months later, Pona was arrested and Jennifer began receiving threats that she would be killed if she testified against him. Jennifer and her mother communicated those threats to the Providence Police Department (“PPD”) and were assured that Jennifer would be safe. The police informed White and Page, the Assistant Attorneys General assigned to the case, of these threats.
 

 On November 15, 1999, Jennifer testified at Pona’s bail hearing. Over the next several months, Jennifer received more death threats and reported them to various Providence police officers including detectives Matos and Finegan, who were investigating the Pona case.
 

 On March 1, 2000, Pona was indicted for murder and later released on bail. On May 15, 2000, White and Page caused a subpoena to be issued directing Jennifer to appear as a witness in Pona’s trial. Two days later, Jennifer, again, expressed concern to representatives of the Attorney General’s office about the death threats she had received. They, again, promised Jennifer that she would be safe; but, on May 21, 2000, Pona shot Jennifer to death in front of her home.
 

 The gist of the plaintiffs § 1988 claims is that the defendants violated Jennifer’s constitutional right to due process by failing to protect her. The defendants argue that the Due Process Clause does not impose a duty on state officials to protect citizens against harm caused by private parties. Although the plaintiff concedes that to be the general rule, she argues that, in this case, such a duty was imposed because the defendants’ actions created the danger and/or that the defendants had a “special relationship” with Jennifer that gave rise to a duty to protect her.
 

 LEGAL STANDARDS
 

 Motion to Dismiss
 

 When considering a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), a court must take all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.
 
 Coyne v. City of Somerville,
 
 972 F.2d 440, 442-43 (1st Cir.1992). Dismissal is appropriate only when it is clear from the allegations in the complaint that the plaintiff will be unable to prove facts sufficient to support the claim for relief.
 
 Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,
 
 228 F.3d 24, 30 (1st.Cir.2000).
 

 Motion for Judgment on the Pleadings
 

 The standard applicable to a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c) is similar to the standard governing motions to dismiss pursuant to Fed.R.Civ.P. 12(b)(6).
 
 Viera-Marcano v. Ramirez-Sanchez,
 
 224 F.Supp.2d 397, 399 (D.P.R.2002). Thus, a court must accept all of the non-movant’s well-pleaded factual averments as true and draw all reasonable inferences in that party’s favor.
 
 Magnum Defense, Inc. v. Harbour Group Ltd.,
 
 248 F.Supp.2d 64, 66 (D.R.I.2003). The only distinction is that, in the case of a Rule 12(c) motion, the question, generally, is not whether the plaintiff might be able to prove additional facts sufficient to support its claim; but, rather, whether it is clear from the facts alleged that the plaintiff cannot prevail.
 
 Rivera-Gomez v. de Castro,
 
 843 F.2d 631, 635 (1st Cir.1988).
 

 Summary Judgment Motion
 

 Summary judgment is warranted when “the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-
 
 *CCXX
 
 tied to a judgment as a
 
 matter of
 
 law.” Fed.R.Civ.P. 56(c).
 

 When a motion for summary judgment is made, a court must view the evidence in the light most favorable to the non-moving party.
 
 Morrissey v. Boston Five Cents Sav. Bank,
 
 54 F.3d 27, 31 (1st Cir.1995). The party opposing summary judgment may not create a dispute by simply pointing to bare allegations of fact, but rather, must “point to specific facts that were properly asserted in its affidavits and supporting materials which, if established at trial, would entitle it to prevail on these matters.”
 
 Over the Road Drivers, Inc. v. Transport Ins. Co.,
 
 637 F.2d 816, 818 (1st Cir.1980).
 

 ANALYSIS
 

 At the outset, it is important to bear in mind the distinction between the plaintiffs § 1983 claims and her state law tort claims as well as the significant differences regarding what she must prove in order to prevail on each type of claim.
 

 I.
 
 Section 198S
 

 Section 1983, itself, does not create any substantive rights. It is simply the vehicle that allows a person to seek redress in federal court when that person’s federally-protected rights are violated by individuals acting under color of state law.
 
 Gilmore v. Buckley,
 
 787 F.2d 714, 719 n. 7 (1st Cir.1986).
 

 In order to prevail under § 1983, a plaintiff must demonstrate the violation of some right conferred by the United States Constitution or federal law.
 
 Id.
 
 at 719. Moreover, § 1983 does not impose liability for conduct that is merely negligent. It requires proof that state or municipal officials intentionally violated the plaintiffs federally-protected rights or that they acted with reckless disregard for the likelihood that those rights would be violated.
 
 Daniels v. Williams,
 
 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986).
 

 By contrast, proof of negligence generally is sufficient to support a state law tort claim and a defendant may be liable in tort even though he or she did not act under color of state law. In addition, under tort law, an injury need not amount to a constitutional violation in order to be compensa-ble. Any physical injury or pecuniary loss caused by the defendant’s wrongful conduct may be sufficient.
 

 Both the Supreme Court and the First Circuit have recognized the importance of distinguishing between § 1983 claims and state law claims. In
 
 DeShaney v. Winnebago County Department of Social Services,
 
 the Supreme Court stated that the Constitution:
 

 does not transform every tort committed by a state actor into a constitutional violation, [citations omitted] A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not “all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment.”
 

 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) (quoting
 
 Daniels,
 
 474 U.S. at 335, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).
 

 Similarly, the First Circuit has pointed out that “[section] 1983 was enacted to deal primarily with acts of discrimination by state officials” and it has cautioned that:
 

 There is a danger that by extending this important legislation to contexts far removed from Congress’- original and overarching purposes, a national state tort claims act administered in the federal courts in effect will be created. Steps in that direction should not be lightly taken
 
 *CCXXI
 
 since the ultimate outcome of such a course might well be incongruent with our role as federal judges.
 

 Gilmore,
 
 787 F.2d at 722 (quoting
 
 Estate of Bailey v. County of York,
 
 768 F.2d 503, 513 (3d Cir.1985)(Adams, J., dissenting)).
 

 II.
 
 The Alleged Due Process Violation
 

 In this case, the constitutional right upon which the plaintiffs § 1983 claims are based is Jennifer’s Fourteenth Amendment right to due process and the question common to all of those claims is whether the allegations are sufficient to establish that the defendants violated that right.
 

 A.
 
 Duty to Protect
 
 — The
 
 General Rule
 

 The Due Process Clause of the Fourteenth Amendment prohibits a state from “depriving] any person of life, liberty, or property, without due process of law.” U.S. Const, amend. XIV. The Due Process Clause “was intended to prevent government ‘from abusing [its] power, or employing it as an instrument of oppression.’ ”
 
 DeShaney,
 
 489 U.S. at 196, 109 S.Ct. 998 (quoting
 
 Davidson v. Cannon,
 
 474 U.S. 344, 348, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986)). Thus, it operates “as a limitation on the State’s power to act, not as a guarantee of certain minimal levels of safety and security.”
 
 Id.
 
 at 195, 109 S.Ct. 998. Put another way, “ ‘[i]ts purpose was to protect the people from the State, not to insure that the State protected them from each other.’ ”
 
 Pinder v. Johnson,
 
 54 F.3d 1169, 1174 (4th Cir.1995) (quoting
 
 DeShaney,
 
 489 U.S. at 196, 109 S.Ct. 998).
 

 Accordingly, “[a]s a general matter ... a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.”
 
 DeShaney,
 
 489 U.S. at 197, 109 S.Ct. 998. As the
 
 DeShaney
 
 Court stated:
 

 [The Due Process Clause] forbids the State itself to deprive individuals of life, liberty, or property without “due process of law,” but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.
 

 Id.
 
 at 195, 109 S.Ct. 998;
 
 see also Martinez v. Colon,
 
 54 F.3d 980, 984-85 (1st Cir.1995) (the Due Process Clause ordinarily does not require a state to protect citizens from private violence [citing
 
 De-Shaney
 
 ]);
 
 Gilmore,
 
 787 F.2d at 721 (a state’s failure to provide adequate protection against possibility of harm by private individuals does not ordinarily violate Due Process Clause).
 

 In
 
 DeShaney,
 
 the Court held that State officials did not deprive Joshua, a minor, of his right to due process by returning him to the custody of his natural father who proceeded to abuse him. The Court cited the general rule that “a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.”
 
 DeShaney,
 
 489 U.S. at 197, 109 S.Ct. 998.
 

 However,
 
 DeShaney
 
 recognized that an exception to the general rule may exist in cases where “the State takes a person into its custody and holds him there against his will” thereby limiting that person’s “freedom to act on his own behalf’ and “render[ing] him unable to care for himself.”
 
 Id.
 
 at 199-200, 109 S.Ct. 998. The Court indicated that, under such circumstances, the Constitution may impose a “duty to assume some responsibility for his safety and general well-being.”
 
 Id.
 
 at 200, 109 S.Ct. 998. This exception is sometimes referred to as the “special relationship” exception.
 
 See Souza v. Pina,
 
 53 F.3d 423, 426 (1st.Cir.1995).
 

 DeShaney
 
 also implies that there is a second exception to the general rule in cases where the injury results from a danger that the State, itself, created or exac
 
 *CCXXII
 
 erbated.
 
 See DeShaney,
 
 489 U.S. at 201, 109 S.Ct. 998 (noting that “[wjhile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.”). This “state created danger” exception has been expressly recognized by several circuit courts.
 
 See Monfils v. Taylor,
 
 165 F.3d 511 (7th Cir.1998);
 
 Kneipp v. Tedder,
 
 95 F.3d 1199 (3d Cir.1996).
 

 B.
 
 The Special Relationship Exception
 

 Here, the plaintiff claims that the “special relationship” exception applies because, by subpoenaing Jennifer to testify, the defendants essentially “held her captive” and restricted her ability to protect herself. That argument misapprehends the type of custody required to establish a “special relationship.”
 

 The “special relationship” exception traces its roots to the Supreme Court’s opinion in
 
 Martinez v. California,
 
 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), which was interpreted by some courts to mean that a “special relationship” imposing an affirmative duty to protect against harm inflicted by third parties arises when “the State learns that a third party poses a special danger to an identified victim, and indicates its willingness to protect the victim against that danger.”
 
 See DeShaney,
 
 489 U.S. at 197 n. 4, 109 S.Ct. 998 (citing cases). However,
 
 DeShaney
 
 expressly rejected that argument.
 
 DeShaney
 
 held that the Due Process Clause does not impose an affirmative duty on states to protect a citizen against harm inflicted by a third party simply because the state is aware of a danger posed by the third party and proclaims its intention to protect against that danger.
 
 DeShaney,
 
 489 U.S. at 197-98, 109 S.Ct. 998. The
 
 DeShaney
 
 Court indicated that the type of “special relationship” giving rise to such a duty is created only when the citizen is involuntarily placed in state custody.
 
 Id.
 
 at 200, 109 S.Ct. 998. The Court explained that:
 

 The affirmative duty to protect arises not from the State’s knowledge of the individual’s predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.... In the substantive due process analysis, it is the State’s affirmative act of restraining the individual’s freedom to act on his own behalf — through incarceration, institutionalization or other similar restraint of personal liberty — which is the “deprivation of liberty” triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.
 

 Id.
 

 Indeed, even before
 
 DeShaney,
 
 the “vast majority” of cases finding the existence of a “special relationship” were cases in which the plaintiff was injured while in state custody.
 
 Gilmore,
 
 787 F.2d at 720-21 (citing cases).
 

 In determining the nature of the custody required in order to create a “special relationship,” the critical inquiry is whether the plaintiffs liberty was involuntarily restrained to an extent “rendering] him unable to care for himself ...”
 
 Monahan v. Dorchester Counseling Ctr.,
 
 961 F.2d 987, 991 (1st Cir.1992) (citing and quoting
 
 DeShaney
 
 );
 
 see Monfils,
 
 165 F.3d at 516 (special relationship exists where “state has custody of a person thus cutting off alternative avenues of aid.”);
 
 D.R. v. Middle Bucks Area Vocational Tech. Sch.,
 
 972 F.2d 1364, 1372 (3d Cir.1992) (student was not held in the “custody” of public school officials because school officials did not restrict student’s freedom of movement to the extent that she was unable to meet her
 
 *CCXXIII
 
 basic needs);
 
 Pinder,
 
 54 F.3d at 1175 (“Promises do not create a special relationship — custody does.”).
 

 In
 
 Monahan,
 
 the First Circuit found that there was no special relationship between state officials and a mental patient who, after voluntarily committing himself to a state-operated facility, jumped from a van that was transporting him back to the facility and was injured by a passing car. 961 F.2d at 990. The
 
 Monahan
 
 Court noted that the State had not taken any affirmative action to hold the plaintiff against his will or render him unable to care for himself. Therefore, the Court held that, while the plaintiff might be able to assert a
 
 tort
 
 claim against the State, he could not assert a § 1983 due process claim because the State had not imposed any restraint on his “freedom to act on his own behalf.”
 
 Id.
 
 at 990-92.
 

 Similarly, in
 
 Middle Bucks,
 
 the Third Circuit found that no “special relationship” existed between public school officials and a student attacked by fellow students because, even though students are legally required to attend school, parents may decide which school they attend or whether to educate them at home and the degree of control exercised over students by school officials is limited.
 
 Middle Bucks,
 
 972 F.2d at 1371-72.
 

 In this case, the facts alleged fall far short of establishing the type of custody required to satisfy the “special relationship” exception. Jennifer never was in State custody. The only restraint on her liberty was the requirement that she appear to testify in response to the subpoena served upon her. Furthermore, that limited restraint did not prevent her from “acting on [her] own behalf’ or render her “unable to care for herself.”
 

 C.
 
 The State-Created Danger Exception
 

 The plaintiff argues that the defendants created the danger to Jennifer by subpoenaing her to testify, promising to protect her and failing to follow procedures established by state law for determining whether she should be placed in the State’s witness protection program.
 

 As already noted, the “state created danger” exception stems from the observation in
 
 DeShaney
 
 that “[wjhile the State may have been aware of the dangers that [the minor plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.” 489 U.S. at 201, 109 S.Ct. 998. As
 
 DeShaney
 
 suggests, the exception applies only where State officials engage in affirmative acts that help to create or increase the risk of injury to plaintiff.
 
 Soto v. Flores,
 
 103 F.3d 1056, 1064-65 (1st Cir.1997);
 
 Pinder,
 
 54 F.3d at 1176-77;
 
 Gilmore,
 
 787 F.2d at 722-23.
 

 In
 
 Gilmore,
 
 a case decided before
 
 De-Shaney,
 
 a woman was murdered by an inmate who was on a two-day furlough from state prison. The decedent’s executor sued State officials, pursuant to § 1983, claiming that they should have known of the danger; and, therefore, that they violated the decedent’s due process rights by failing to protect her. The First Circuit rejected that argument and affirmed the entry of summary judgment in the defendants’ favor. The Court stated that:
 

 [Irrespective of any knowledge the state defendants had of the special danger that [the inmate] posed to [the decedent] or the temporal proximity between [the inmate’s] release on furlough and [the decedent’s] murder, the state did nothing to render [the decedent] any more or less capable of defending her
 
 *CCXXIV
 
 self from a violent attacker than any other member of the general public.
 

 Gilmore,
 
 787 F.2d at 721.
 

 In
 
 Soto,
 
 the First Circuit again had occasion to address the circumstances under which the “state created danger” exception applies. There, a woman told police that her husband had abused her and threatened to kill her and her family if she reported it. Despite that threat, two police officers visited the husband and, in an apparent effort to deter him, informed the husband that his wife wanted to have him jailed in order to stop the abuse. The husband responded by shooting the couple’s two young children to death and killing himself. The wife then brought a § 1983 action against police officials alleging a due process violation.
 

 The First Circuit acknowledged that, under
 
 DeShaney,
 
 the wife’s claim would be barred because “ ‘a State’s failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.’ ”
 
 Soto,
 
 103 F.3d at 1063 (quoting
 
 DeShaney,
 
 489 U.S. at 197, 109 S.Ct. 998). However, the Court noted that the plaintiff was not alleging “a mere failure to protect”; but, rather, she was alleging the commission of an “affirmative act [that] rendered her children more vulnerable to the danger posed by [her husband].”
 
 Id.
 
 In discussing that distinction, the Court stated:
 

 Not every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger “take[s] on the added character of [a] violation [ ] of the federal Constitution.” [citation omitted] In a creation of risk situation, where the ultimate harm is caused by a third party, courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action.
 

 Id.
 
 at 1064.
 

 The
 
 Soto
 
 court did not decide whether the “state created danger” exception applied because it found that the defendants were entitled to qualified immunity. However, in a similar case, the Fourth Circuit held that the exception was inapplicable because the danger had not been created or exacerbated by any affirmative act on the part of the State.
 
 See Pinder, 54
 
 F.3d 1169 (4th Cir.1995).
 

 In
 
 Finder,
 
 the plaintiffs former boyfriend broke into her home, assaulted her, and threatened to murder her and her three children. The police were summoned and the officer who responded arrested the boyfriend and assured the plaintiff that the boyfriend would be locked up overnight. Based on that assurance, the plaintiff went to work. Shortly thereafter, the officer brought the boyfriend before a bail commissioner but charged him only with trespassing and malicious destruction of property. As a result, the boyfriend was released on his own recognizance and was warned to stay away from the plaintiffs home. Despite that warning, the boyfriend set fire to the plaintiffs home killing her three children. The plaintiff then brought a § 1983 action against the officer and municipal officials alleging a violation of the Due Process Clause. She claimed that, by their conduct, the defendants had affirmatively created or enhanced the danger to her children.
 

 The Fourth Circuit rejected what it described as the plaintiffs “attempt to escape the import of
 
 DeShaney
 
 by characterizing her claim as one of
 
 affirmative
 
 misconduct by the State in ‘creating or enhancing’ the danger, instead of an omission.”
 
 Id.
 
 at 1175 (emphasis in original). The Court found that the officer’s decision not to charge the boyfriend with a more
 
 *CCXXV
 
 serious offense was not an “action” that created the danger. In rebuffing the contention that it was, the Court stated:
 

 By this measure, every representation by the police and every failure to incarcerate would constitute “affirmative actions,” giving rise to civil liability ... No amount of semantics can disguise the fact that the real “affirmative act” here was committed by [the boyfriend], not by [the officer]. As was true in
 
 DeSha-ney,
 
 the State did not “create” the danger, it simply failed to provide adequate protection from it.
 

 Id.
 

 The facts alleged in this case are very similar to those in
 
 Buckley, Soto,
 
 and
 
 Pin-der.
 
 Like those cases, this case involves a heartbreaking tragedy and, arguably, a failure by State and/or municipal officials to do all that might have been done to prevent the tragedy from occurring. But, also like those cases, this case does not involve the kinds of affirmative acts necessary to trigger the “state created danger” exception.
 

 The conduct cited by the plaintiff consists, primarily, of the defendants’ alleged failure to act. The only “act” that the plaintiff attributes to the defendants is the issuance of the subpoena. However, that single “act” cannot reasonably be viewed as having created the danger to Jennifer or having made her more vulnerable to that danger. Pona clearly knew, long before the subpoena was issued, that Jennifer was a witness to the crime and likely to testify against him. It was that fact and not the fact that a subpoena was issued that created the danger. Indeed, it is not even alleged that Pona was aware of the subpoena.
 

 Moreover, even if issuance of the subpoena was the type of affirmative act that imposed a constitutional duty on the defendants to protect Jennifer, the facts alleged fail to establish that the defendants’ breach of that duty is actionable under § 1983. As previously stated, § 1983 requires proof that a defendant intentionally violated the plaintiffs federally protected rights or that the defendant acted with reckless disregard of those rights.
 
 Daniels,
 
 474 U.S. at 331-33, 106 S.Ct. 662. Here, the gist of the complaint is that the defendants were negligent in failing to protect Jennifer. It is not alleged that the defendants acted intentionally or recklessly in failing to provide Jennifer with adequate protection. Rather, it is alleged that they did not exercise due care and diligence. „
 

 Accepting the proposition that, whenever State officials issue subpoenas to prospective witnesses, they have a constitutionally-imposed obligation to protect those witnesses from harm inflicted by third persons and that they may be held liable for failure to provide adequate protection would create a “state created danger” exception that swallows the general rule. Accepting that proposition also would obliterate the distinction between the intentional misuse of State authority to violate an individual’s federal constitutional rights which is actionable under § 1983 and the negligent failure to take steps required by State law in order to avoid injury to another person which may be the basis for a tort action.
 

 In short, while the plaintiff might have a viable negligence claim against one or more of the defendants, the defendants’ alleged failure to have “done more” to protect Jennifer does not rise to the level of a constitutional due process violation.
 

 D.
 
 The Effect of State Law
 

 The plaintiff argues that Rhode Island’s “witness protection statute,” R.I.G.L. § 12-30-1
 
 et seq.,
 
 imposed a duty
 
 *CCXXVI
 
 on the defendants to protect Jennifer and that their alleged failure to comply with the statute violated Jennifer’s substantive and procedural due process rights.
 
 [2]
 
 That argument is not persuasive because, even assuming,
 
 arguendo,
 
 that the defendants did not follow the statutory requirements, it is well settled that a failure to comply with state law does not establish the basis for a federal due process violation.
 
 Middle Bucks,
 
 972 F.2d at 1375 (“a violation of a state law duty, by itself, is insufficient to state a § 1983 claim”). State law plays a role in due process jurisprudence only to the extent that it creates the property interests that are constitutionally protected.
 
 See Board of Regents v. Roth,
 
 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (“Property interests ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.”).
 

 E.
 
 The “Shocks the Conscience” Test
 

 In her reply memoranda, the plaintiff makes a passing reference to what has been referred to as the “shocks the conscience” theory of liability for substantive due process violations. Under that theory, a due process violation may be based on conduct by a state official that “shocks the conscience” even though there has been no deprivation of an identifiable liberty or property interest.
 
 See United States v. Salerno,
 
 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987);
 
 Brown v. Hot, Sexy and Safer Prods., Inc.,
 
 68 F.3d 525, 531 (1st Cir.1995).
 

 Unfortunately, there is no precise definition of what constitutes “conscience shocking” conduct. It has been variously referred to as conduct that is “arbitrary and capricious,” “violative of universal standards of decency,” or “counter to the concept of ordered liberty.”
 
 Cruz-Erazo v. Rivera-Montanez,
 
 212 F.3d 617, 622 (1st Cir.2000).
 

 However, it is clear that conduct is not “conscience shocking” if it is merely careless or even reckless.
 
 County of Sacramento v. Lewis,
 
 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Something approaching “mean-spirited brutality” is required.
 
 Brown,
 
 68 F.3d at 532.
 

 The allegations in this case fall far short of meeting this demanding standard. The plaintiff does not claim that the defendants acted maliciously or with any intent to cause harm to Jennifer. While it may be argued that they were negligent, their conduct hardly can be described as “conscience shocking.”
 

 III.
 
 The Other Claims and Defenses
 

 Since this Court has found that the facts alleged, here, are insufficient to establish a due process violation, there is no need to address the defendants’ arguments that their motions with respect to the § 1983 claims also should be granted on other grounds such as qualified immunity and absolute immunity.
 

 
 *CCXXVII
 
 Nor is there any need to address the State’s motion to dismiss the state law claims. The § 1983 claims provided the sole basis for invoking federal jurisdiction and all of those claims are being dismissed. In such cases, a federal court has discretion to decide whether it should retain supplemental jurisdiction over the remaining state law claims.
 
 See
 
 28 U.S.C. § 1867(c);
 
 United Mine Workers of America v. Gibbs,
 
 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966);
 
 Camelio v. American Fed’n,
 
 137 F.3d 666, 672 (1st Cir.1998). Among the factors that courts consider in making that decision are fairness, comity, and judicial economy.
 
 Camelio,
 
 137 F.3d at 672. Generally, “if the federal claims are dismissed before trial ... the state claims should be dismissed as well” in order to avoid “needless decisions of state law ... and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.”
 
 Gibbs,
 
 383 U.S. at 726, 86 S.Ct. 1130;
 
 see Camelio,
 
 137 F.3d at 672;
 
 Rodriguez v. Doral Mortgage Corp.,
 
 57 F.3d 1168 (1st Cir.1995).
 

 In this case, there is no reason to depart from the general rule. The remaining claims deal solely with issues of state law, some of which raise important questions of first impression. Principles of comity demand that those questions should be addressed in state court. Nor would dismissal result in any discernible unfairness to the parties. The dismissal will be without prejudice to the plaintiffs right to bring her state law claims in state court. Therefore, she will not be deprived of her day in court with respect to those claims. Indeed, during oral argument, plaintiffs counsel expressed a preference to have the state law claims dismissed without prejudice if the defendant’s motions regarding the federal claims were granted.
 

 CONCLUSION
 

 For all of the foregoing reasons, the State’s Motion to Dismiss; White and Page’s Motion to Dismiss; Matos and Fi-negan’s Motion to Dismiss; the City’s Motion for Judgment on the Pleadings, and Prignano’s Motion for Summary Judgment are granted with respect to all of the § 1983 claims and the remaining state law claims are dismissed without prejudice to the plaintiffs right to re-file them in state court.
 

 IT IS SO ORDERED.
 

 [1]
 

 . Motions to dismiss have been filed by the State; Assistant Attorneys General Randy White and George Page ("White and Page"); and Detectives Matos and Finegan ("Matos and Finegan”).
 

 [2]
 

 .
 
 The relevant portion of the statute provides:
 

 Whenever any law enforcement official of the state or any city or town determines that a prospective witness who is not incarcerated, charged, or under investigation for commission of a felony requires custodial protection and/or assistance with relocation due to a threat to the safety of that witness or his or her family, the official shall immediately notify the attorney general.
 

 R.I.G.L. § 12-30-4
 

 If an assistant attorney general and law enforcement officials determine that the witness needs protection, the assistant attorney general must submit a proposal to the Witness Protection Review Board which decides whether protection should be provided.
 
 Id.