In re Court Order Dated
October 22, 2003.

Nos. 2003–613–M.P., 2003–614–M.P.

Supreme Court of Rhode Island.

July 19, 2005.

Joseph V. Cavanagh, Jr., Esq., Providence, for Petitioner.

Michael W. Field, Esq., for Respondent.

Before: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

FLAHERTY, Justice.

"[I]n order to enjoy the inestimable benefits which the liberty of the press ensures, it is necessary to submit to the inevitable evils which it engenders." [1]

At issue here is the propriety of contempt citations issued to certain members of the news media who are alleged to have violated a trial court order prohibiting the publication of information or photographs in connection with a sensational murder trial. Because a witness to a previous related trial had been murdered on the eve of her testimony, the state filed a motion intended to protect those persons expected to testify in the subsequent trial. We are called upon to determine the constitutional soundness of the trial court's order and the implication for those members of the media who are accused of violating it.

This case centers around an October 22, 2003 Superior Court order entered just prior to the start of the trial of Charles Pona, a convicted murderer who faced further charges, including obstruction of justice, conspiracy to commit murder, and murder of an eyewitness who had been killed the night before she was scheduled to testify against him. Granted upon a motion made by the state, the order in question was tailored to ensure witness safety, and included prohibitions against the publication of specified identifying information and/or visual depictions of the witnesses' faces. Soon after the motion was granted, each of the petitioners, the Providence Journal Company and its reporter Karen A. Davis, and WLNE–6 and its employees Josie Guarino and Tara Baxter, allegedly violated the order, precipitating the state's institution of contempt-of-court proceedings against them. On January 9, 2004, this Court granted the petitioners' petition for writ of certiorari, requesting that we review the October 22, 2003 order as well as the trial court's subsequent orders directing the petitioners to show cause why they should not be held in contempt thereof. For the reasons stat-

---

1. *Leddy v. Narragansett Television, L.P.*, 843 A.2d 481, 491 (R.I.2004) (quoting Alexis de Tocqueville, 1 *Democracy in America*, 184 (rev. ed., translated by Henry Reeve, Colonial Press 1900)).

ed below, we quash the show-cause orders entered by the Superior Court.

## Facts and Procedural History

In the spring of 2000, Charles Pona stood trial for the 1999 shooting death of Hector Feliciano. He was found guilty and sentenced to life in prison for his crimes.[2] Among the several witnesses whose statements lead to Pona's arrest for the murder was Jennifer Rivera, a fifteen-year-old girl, who identified Pona as the man she saw running away from the scene of the crime when she looked out her kitchen window after hearing gunshots. Although Rivera's account of the murder was memorialized in her signed police statements and her testimony at Pona's bail hearing, she never took the stand in Pona's murder trial; after months of being threatened that she would be killed if she testified against Pona, Rivera was gunned down the night before she was scheduled to testify, shot twice in the head at close range.[3]

Three individuals have been held responsible for Jennifer's death: Charles Pona, his half brother Dennard Walker, and Miguel Perez. Intent on preventing Jennifer from testifying, the men sought Jennifer out and ambushed her on a city street, with Walker firing the fatal shots. Both Walker and Perez pleaded guilty to killing Jennifer Rivera. It was Charles Pona's trial, however, that gave rise to the court order at issue here. In the fall of 2003, Pona went on trial for the charges relating to Jennifer's death, which included murder, conspiracy, and obstruction of the judicial system, all of which eventually resulted in guilty verdicts.[4] The trial was scheduled to commence on October 20, 2003, but was continued until October 27, 2003. In the meantime, on October 22, 2003, the state filed, without objection, a "Motion to Ensure Witness Safety," asserting that precautionary measures were necessary to protect witnesses in the upcoming trial. The motion stated in pertinent part that

"(3) Dennard Walker and Miguel Perez have already pleaded guilty to killing Jennifer Rivera, in conspiracy with Charles Pona, for the purpose of preventing Jennifer Rivera from testifying against Charles Pona at his murder trial for the killing of Hector Feliciano.

"(4) During investigation into the murder of Jennifer Rivera, telephone calls and conversations were intercepted at the ACI and other penal institutions wherein Dennard Walker, among others, discussed killing a prosecutor in the Feliciano trial and cooperating witnesses in the Jennifer Rivera murder investigation.

"(5) Based upon the aforementioned information and good faith belief, the State submits that precautionary measures should be ordered by this court to ensure the safety of civilian witnesses who may testify at trial in the instant matter."

Justifiably concerned with security, the trial justice directed that all motions made

---

**2.** In addition to his murder conviction, Pona was convicted of carrying a pistol without a license and attempted statutory burning. He has appealed all three of these convictions.

**3.** Subsequent to Jennifer's murder, her family members brought a 42 U.S.C. § 1983 suit in the United States District Court for the District of Rhode Island against state prosecutors, the City of Providence, and several Providence police officers, alleging that the defendants deprived Jennifer of her constitutional right to due process by failing to protect her. The federal court ruled in favor of the defendants. *Rivera v. Rhode Island*, 312 F.Supp.2d 175 (D.R.I.2004), *aff'd*, 402 F.3d 27 (1st Cir.2005).

**4.** Pona has appealed his convictions relating to the death of Jennifer Rivera.

prior to and during the trial were to be filed with him, rather than in the Superior Court clerk's office. The criminal file and docket remained in the personal custody of the trial judge. Thus, the state's motion was presented to the trial justice in chambers, and it was not immediately entered into the criminal docket. Without holding a hearing on the matter or providing notice to any members of the media, and with neither a stenographer nor clerk present in his chambers, the trial justice granted the state's motion and issued an order consisting of the following:

"A. That either of the litigant parties, or the clerk of court, refrain from asking any State witness to state their current address of residence or place of employment in court;

"B. That no State witness be compelled to state their current address of residence or place of employment in court;

"C. If news media (radio, print, television) are allowed in court during the trial, they are to be ordered NOT to publicize the current address of residence or place of employment of any State witness, or the address of residence or place of employment of any State witness' family member(s);

"D. If news media (radio, print, television) are allowed in court during the trial, they are to be ordered NOT to photograph, videotape, or artistically reproduce the face of any State witness.

"E. If news media (radio, print, television) are allowed in court during the trial, they are to be ordered NOT to publicize any visual depiction of the face of any State witness, whether by photograph, videotape, or artistic reproduction.

"F. That all affected parties be advised that a violation of the court's Order shall be punishable by any means available to the court consistent with the Court's inherent authority to punish contemptuous acts."

After the trial justice signed the order in chambers, it was placed in Pona's criminal file; a single copy was made and provided to the state (and only the state). A week later, on October 30, the trial justice distributed the order to some members of the media who were informally assembled in the courtroom. The parties have agreed that neither Guarino nor Baxter was present in the courtroom and that neither received a copy of the order at that time. The parties further agree, however, that at least one reporter covering the trial for WLNE–6 did receive the order, but did not forward it to or advise Baxter or Guarino of it. Although Karen Davis of the Providence Journal was in the courtroom at the time of the distribution, she did not receive a copy of the order.

It is alleged that over the course of the following week, each of the petitioners violated the terms of the order, irrespective of who knew about the limitations imposed upon them. Despite the specific proscriptions listed in the order, members of the media were allowed in the courtroom once the trial began. It was not until November 6, 2003, however, that the trial justice ordered a blanket prohibition of camera coverage. The state alleged several violations of the restrictive order, none of which has either been established in the record or denied by petitioners. The claimed violations include the following incidents: On October 30, 2003, the very same day that the order was informally distributed to various members of the media by the trial justice, a reporter from WLNE mentioned the order on the six o'clock news, indicating WLNE's awareness of its existence. Nevertheless, on November 4, 2003, after WLNE cameraperson Tara Baxter videotaped the testimony of state's witness Dennis Fullen, WLNE's six o'clock news aired

the videotape, including pictures of Fullen's face, with identifying information and commentary from reporter Josie Guarino. During that same broadcast, WLNE disclosed the name and identity of future state's witness Miguel Perez, and broadcast previously recorded video footage of him, also in apparent violation of the terms of the order. The next day, WLNE again displayed previously recorded footage of Perez, stated his name, and identified him as a state's witness. The state alleged that the restrictive order also was violated on November 7, 2003, when the Providence Journal published an article by Karen Davis titled "Rivera's murderer testified he acted alone." The article described Perez's testimony and was accompanied by a file photograph of him.

One week later, on November 14, the state began its efforts to bring contempt charges against petitioners.[5] In response to the state's applications for show-cause orders, the court issued two orders, one directed at WLNE, Baxter, and Guarino, and the other directed at The Providence Journal and Davis, directing the petitioners to appear on November 26, 2003, to show cause why they should not be held in contempt. The petitioners then argued for the stay of the restrictive and show-cause orders, both of which the trial justice denied at a November 24 hearing on the matter. That same day, petitioners requested that this Court issue a writ of certiorari to review both orders. After considering the submissions of counsel, and expressing our serious reservations about the constitutional propriety of the restrictive order, this Court granted certiorari, and stayed the contempt proceed-ings indefinitely. We deferred further proceedings on certiorari, remanding the matter to the trial justice to "conduct an evidentiary hearing and issue findings of fact on the questions:

a) whether these petitioners received any notice of the motion and other court proceedings that led to the entry of the October 22nd order;

b) whether these petitioners or any of their representatives were present in court when the motion or other proceedings that led to the October 22nd order occurred;

c) whether these petitioners were served with the October 22nd order following its issuance and, if not, the manner in which they were apprised of its provisions; and

d) whether pursuant to sections C, D, and E of the October 22nd order, the petitioners, after being allowed in court during the trial, were ordered not to engage in the activities proscribed therein, and whether they were given any opportunity to argue to the court why the order should not apply to them."

To our dismay, the trial court and the parties did not comply with our order, and the evidentiary hearing was not conducted. Instead, the parties entered into a consent order in which they stipulated to certain facts.[6] In our opinion, the stipulated facts do not address all the questions we raised in our order. Nonetheless, petitioners argue that the issuance of the restrictive order was both procedurally and substantively flawed, and that both the restrictive and show-cause orders should, therefore, be vacated. The petitioners contend that

---

**5.** The record indicates that as it relates to petitioners Guarino, Baxter, and WLNE, the state and Charles Pona filed a joint application for a show-cause order. As it relates to petitioners Davis and the Providence Journal, the state alone filed an application for a show-cause order.

**6.** This consent order is appended as Exhibit A.

they and other representatives of the media were entitled to notice and hearing before the restrictive order was issued, that the resulting order is an overbroad, unconstitutionally invalid prior restraint on free speech, and that they should not be held in contempt of an order they allege to be patently invalid and void. The petitioners further request costs and attorney's fees associated with their defense.

## Standard of Review

"Article XII of amendments to our state constitution specifically reserves to this [C]ourt the power to exercise 'final revisory and appellate jurisdiction upon all questions of law and equity.' * * * Review is discretionary and generally accomplished by way of the common law writ of certiorari." *Lynch v. King*, 120 R.I. 868, 873, 391 A.2d 117, 120–21 (1978). "Our review on a writ of certiorari is restricted to an examination of the record to determine whether any competent evidence supports the decision and whether the decision maker made any errors of law in that ruling." *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 577 (R.I.1997); *see also Brouillette v. Department of Employment and Training Board of Review*, 677 A.2d 1344, 1346 (R.I.1996). Here, we have been asked to rule on the validity of a Superior Court order, and its resulting contempt orders. For this reason, we shall now determine whether the trial justice's decision was in error.

## Analysis

### I

### The Show–Cause Orders: Notice

In its brief submitted to this Court, the state concedes that there is insufficient evidence to establish that petitioners Guarino, Baxter, Davis, and the Providence Journal willfully or intentionally violated the restrictive order, and that as a result, the orders directing these petitioners to show cause should be quashed. The state acknowledges that for these petitioners to be held in contempt, it must be established that they are "guilty of an intentional or willful disobedience" to the restrictive order. *State v. Brown*, 599 A.2d 728, 729 (R.I.1991). It is true that the heart of criminal contempt is "[t]he element of intentional and deliberate disobedience to a court order * * *[,]" *id.*, whereas "[w]illfullness need not be shown as an element of civil contempt." *Trahan v. Trahan*, 455 A.2d 1307, 1311 (R.I.1983). The state admits that Guarino, Baxter, Davis, and the Providence Journal did not receive actual notice of the restrictive order, and that consequently, they cannot be found to have willfully disobeyed it. The state does not concede the same point with regard to petitioner WLNE because, as the parties have agreed, at least one reporter from WLNE received a copy of the order at the time it was distributed by the trial justice.

Because of its concessions, the state presents us with what is essentially a mootness argument; it contends that because it chooses not to pursue the contempt charges, we need not further address the restrictive order as it relates to these petitioners. However, "a determination of mootness may not end our judicial review. This Court will review an otherwise moot case when the issues raised are of extreme public importance and likely to recur in such a way as to evade judicial review." *Foster–Glocester Regional School Committee v. Board of Review*, 854 A.2d 1008, 1013 (R.I.2004). As we said when we granted certiorari in this case, we have "serious reservations regarding the constitutionality of the October 22nd order" and we believe the issue to be of extreme public importance. Thus, the state's concession, and its declination to

pursue contempt charges against Guarino, Baxter, Davis, and the Providence Journal, does not effectively close the door on our inquiry with respect to the order and its applicability to all of the petitioners.

 We acknowledge the state's concessions, but believe that further discussion and analysis is required before quashing the contempt orders. In our opinion, a failure of due process is the poison that sours this restrictive order and which prevents even contemplation of contempt proceedings. We believe it axiomatic that a person or entity should not be subject to a contempt citation for committing a forbidden act about whose prohibition the person or entity was unaware; nonetheless we cite several legal authorities to support that axiom. It is well established under Rhode Island law that "[t]o be enforceable by contempt proceedings, an order should be clear and certain in its terms and should be sufficient to enable one reading it to learn therefrom what he may or may not do." *School Committee of North Providence v. North Providence Federation of Teachers, Local 920*, 468 A.2d 272, 276 (R.I.1983) (citing *School Committee of Pawtucket v. Pawtucket Teachers' Alliance, Local No. 930*, 117 R.I. 203, 209, 365 A.2d 499, 503 (1976); *Sunbeam Corp. v. Ross–Simons, Inc.*, 86 R.I. 189, 194, 134 A.2d 160, 162–63 (1957)). Further, "[t]he judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. * * * The most fundamental postulates of our legal order forbid the imposition of a penalty for disobeying a command that defies comprehension." *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 17 (1st Cir.1991) (quoting *International Longshoremen's Association, Local 1291 v. Philadelphia Marine Trade Association*, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967)). Clarity is a guiding principle

in the scheme of judicial contempt, and "derives from the concepts of fairness and due process." *Kemp*, 947 F.2d at 17.

 In the first place, a precondition to the issue of a party's understanding the terms of a restrictive order is an awareness that the order exists and knowledge of the individuals at whom it is directed. The question of clarity does not even arise if one is not put on notice that the order is in place.

"A corollary of the requirement that orders enforceable through the contempt power be clear and unambiguous is that those who would suffer penalties for disobedience must be aware not merely of an order's existence, but also of the fact that the order is directed at them. This tenet has not been stated frequently. Withal, the relative rarity of articulation testifies more to the sheer obviousness of the principle * * *." *Kemp*, 947 F.2d at 17.

Thus,

"[a] court order, then, must not only be specific about what is to be done or avoided, but can only compel action from those who have adequate notice that they are within the order's ambit. For a party to be held in contempt, it must have violated a clear and unambiguous order that left no reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion." *Id.*

 On the state of the record and in the absence of the evidentiary hearing that was expressly requested by us in our order of January 9, 2004, it is our opinion that it would be unjust and inappropriate to reorder a contempt hearing. The parties generally agree that petitioners Guarino, Baxter, Davis, and the Providence Journal did not receive notice of the restrictive order. The parties further agree that someone associated with WLNE received

a copy of the order. However, the record is silent as to who this person was, what he or she did with the order, and whom he or she may have told about the restrictions. Thus, while it appears that an employee at WLNE received notice of the order, there are insufficient facts in the record to establish that WLNE, as a corporate entity, had sufficient notice to be held in contempt for violating the order. Without any evidence sufficient to provide support for the proposition that any of the named petitioners received notice of the restrictive order and its mandate, we cannot assign to them a duty to comply with that order or contemplate sanctioning them for failing to comply. Because petitioners were not given adequate notice of the restrictive order, they effectively were denied the due process to which they were entitled. Therefore, we quash the show-cause orders.

## II

### The Restrictive Order

 Although we have decided this case on due process grounds, we also address our continuing grave reservations with regard to the propriety of the restrictive order.[7] As succinctly put by the First Circuit Court of Appeals,

"[t]he power to censor is the power to regulate the marketplace of ideas, to impoverish both the quantity and quality of debate, and to restrict the free flow of criticism against the government at all levels. It is plain now as it was to the framers of the Constitution and Bill of Rights that the power of censorship is, in the absence of the strictest constraints, too great to be wielded by any individual or group of individuals." *Matter of Providence Journal Co.*, 820 F.2d 1342, 1345 (1st Cir.1986), *modified on reh'g*, 820 F.2d 1354 (1st Cir.1987) (en banc), *cert. dismissed*, 485 U.S. 693, 108 S.Ct. 1502, 99 L.Ed.2d 785 (1988). In this case, we have no doubt as to the sincerity of the trial justice nor do we question his motive in attempting to protect the lives of those citizens willing to come forward and testify in a criminal trial. Although the "guarantees of freedom of expression are not an absolute prohibition under all circumstances, * * * the barriers to prior restraint remain high and the presumption against its use continues intact." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 570, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Also, "prior restraint on speech and publication are the most serious and the least tolerable in-

---

7. Ordinarily, we are quite reluctant to reach constitutional issues when there are adequate non-constitutional grounds upon which to base our rulings. *See, e.g., Whyte v. Sullivan*, 119 R.I. 649, 652, 382 A.2d 186, 187 (1978) ("Determination of the constitutional question raised by petitioner is * * * not indispensably necessary to the disposition of the case, and consequently that question will not be decided."); *State v. Berberian*, 80 R.I. 444, 445, 98 A.2d 270, 270–71 (1953) ("[T]his court will not decide a constitutional question raised on the record when it is clear that the case before it can be decided on another point and that the determination of such question is not indispensably necessary for the disposition of the case."); *see also Mathieu v. Board of License Commissioners of Jamestown*, 115 R.I. 303, 307, 343 A.2d 1, 3 (1975); *Chartier Real Estate Co. v. Chafee*, 101 R.I. 544, 556, 225 A.2d 766, 773 (1967); *see generally Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.").

Nevertheless, we have decided to depart from our usual practice in this instance. The constitutional issues which lie just below the surface of this case are important, and the likelihood of their presenting themselves again is great. Therefore, we consider it advisable to take this opportunity to reiterate certain key principles.

fringement on First Amendment rights." *Id.* at 559, 96 S.Ct. 2791. *See also Tory v. Cochran,* —— U.S. ——, 125 S.Ct. 2108, 161 L.Ed.2d 1042 (2005). Further, "damage can be particularly great when the prior restraint falls upon the communication of news and commentary on current events. Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment." *Nebraska Press,* 427 U.S. at 559, 96 S.Ct. 2791. *See also Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492–93, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

On a previous occasion, this Court applied much of the United States Supreme Court's free speech jurisprudence to a case involving a protective order entered before the extortion, assault, kidnapping, and conspiracy trial of former Providence Mayor Vincent Cianci. *State v. Cianci,* 496 A.2d 139 (R.I.1985). When issuing orders that may amount to a prior restraint on publication, we caution trial justices to follow the guidelines set forth in *Nebraska Press* and *Cianci.*[8] Although we decline to further address the constitutionality of the October 22, 2003 restrictive order at this time, we hereby quash that order due to the fact that the Pona trial has long been over and the protections that might have been afforded by the restrictive order are no longer necessary.

### III

### Attorney's Fees

 The petitioners, without providing legal support for their argument, request that this Court award them costs and attorney's fees. Under Rhode Island law, "[i]t is well settled that attorneys' fees may not be appropriately awarded to the prevailing party absent contractual or statutory authorization." *Mello v. DaLomba,* 798 A.2d 405, 410 (R.I.2002). In this case, there is no applicable statutory authority governing attorney's fees. Therefore, we deny the petitioners' request for costs and attorney's fees.

### Conclusion

For the foregoing reasons, we quash the orders of the Superior Court. The record shall be remanded to the Superior Court with our decision endorsed thereon.

GOLDBERG, J., concurring, in part, and dissenting in part and joining in the judgment.

I concur in the holding of the majority that there is no evidence that this order was served upon any party against whom a contempt citation issued. For me, however, that is the end of this case. I am of the opinion that we should not proceed further, especially by way of dicta, into the hallowed ground of First Amendment jurisprudence. Simply put, there can never be prior restraint without restraint in the first instance. In this case, that did not come to pass.

I am also disturbed by the fact that the parties, with the apparent concurrence of the trial justice, disregarded our order and produced a set of "stipulated facts" with-

---

8. Orders involving in-court videotaping and photographing are subject to a different analysis, however. Indeed, we have held that the "electronic media have no First Amendment right to photograph or broadcast judicial proceedings." *In re Extension of Media Coverage for a Further Experimental Period,* 472 A.2d 1232, 1234 (R.I.1984); *see also Chandler v. Florida,* 449 U.S. 560, 569, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981); *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 610, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978). We acknowledge that a trial justice has wide discretion to limit or exclude such media coverage under Article VII, Canon 11 of the Supreme Court Rules of Media Coverage of Judicial Proceedings.

out affording the trial justice an opportunity to reach the only possible conclusion in this case—outright dismissal. Of course, dismissal would not have resulted in the pronouncements this Court makes today; it would have assigned this case to the graveyard of dismissed cases.

This Court granted certiorari and remanded this case to the trial justice with directions to conduct an *evidentiary hearing* and issue findings of fact on four specific questions, all related to notice and service of process. The bottom line in this case is that no one accused of contempt was served with the order or otherwise made subject to its terms. That is the end of the inquiry, and the trial justice, following the evidentiary hearing we ordered, should have so declared.

I am not alone in my reluctance to pronounce as dicta important holdings respecting the First Amendment; the state did not brief or otherwise address the issues discussed in Part II of the majority opinion. The United States Supreme Court has stressed:

> "[I]f there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not pass on questions of constitutionality * * * unless such adjudication is unavoidable." *Jean v. Nelson,* 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) (quoting *Spector Motor Service v. McLaughlin,* 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944)).

In this case, I am of the opinion that the constitutional issue is not only avoidable, it is nonexistent—no one was restrained in this case. Because, as the majority declares, issues concerning "prior restraint on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *see Nebraska Press Association v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), and we have never before been confronted with this precise issue, I am of the opinion that we should leave this discussion for another day. I respectfully disagree with the majority's conclusion that these constitutional issues "lie just below the surface" or that "the likelihood of their presenting themselves again is great." A case concerning the prior restraint of the press has never before floated to the top of our jurisprudence, and I prefer to wait until the hook is firmly in the mouth of a justiciable controversy before venturing into the deep water. I believe that this Court timely and appropriately responded to the glaring (and fatal) defects in the state's efforts to have these petitioners found in contempt and have every confidence, if called upon to do so in a proper case, we will rise to the occasion. Consequently, I dissent.

### EXHIBIT A

### STATE OF RHODE ISLAND

### SUPERIOR COURT

### PROVIDENCE, SC.

### IN RE: COURT ORDER DATED OCTOBER 22, 2003

### M.P. No. 2003–6006

### *CONSENT ORDER*

In accordance with the Rhode Island Supreme Court's Order dated January 9, 2004, in the matters captioned *In re: Court Order Dated October 22, 2003,* M.P. Nos.2003–613 and 2003–614, petitioners The Providence Journal Company (the "Journal"), its employee, reporter Karen A. Davis ("Davis"), WLNE–6 and its employees, reporter Josie Guarino ("Guarino") and cameraperson "Jane Doe" (now identified as Tara Baxter) ("Baxter"), and respondent, the State of Rhode Island, by and through their counsel, and with the

Consent of this Court, submit the following stipulated facts:

1. The criminal action, captioned *State v. Charles Pona*, P1/02–2571–AG, was scheduled for trial on October 20, 2003 before Judge William Dimitri. At the request of defendant's counsel, James A. Ruggiero, the trial was continued to October 27, 2003.

2. At Judge Dimitri's direction, all motions just prior to and during trial were to be filed with him rather than in the Superior Court Clerk's office. From at least October 20, 2003 through jury verdict on November 14, 2003, the criminal file and docket were at all times maintained in the chambers of Judge Dimitri.

3. On October 22, 2003, the State, through Assistant Attorney General Ronald Gendron ("Gendron"), presented a Motion to Ensure Safety of Witnesses (the "Motion") to Judge Dimitri. The Motion was presented to Judge Dimitri in chambers and was not received by nor entered into the criminal docket by any clerk of the Superior Court.

4. There being no objection to the Motion by defense counsel, Gendron advised Judge Dimitri of the same in chambers on October 22, 2003, and requested Judge Dimitri to act on the Motion. Judge Dimitri advised Gendron that he would grant the Motion, and directed that Mr. Gendron prepare an order to that effect. There was no stenographer or clerk present in chambers when the Motion was presented and considered, and there was otherwise no recording of such matters considered in chambers.

5. Later on the same day, October 22, 2003, Gendron returned to meet with Judge Dimitri in chambers and presented an order granting the Motion ("the October 22, 2003 Order"). The October 22, 2003 Order was signed by Judge Dimitri in chambers. There was no stenographer or clerk present in chambers when the Order was presented, considered and signed, and there was otherwise no recording of such matters considered in chambers. Judge Dimitri's designated clerk received the signed Order on that day and placed the same in the criminal file, which remained in Judge Dimitri's chambers throughout the trial and verdict.

6. A single copy of the October 22, 2003 Order was made by Judge Dimitri's designated clerk and provided to Gendron on October 22, 2003.

7. None of the individual petitioners nor anyone from the Journal or WLNE received notice of the Motion and/or the chambers conferences that led to the entry of the October 22, 2003 Order by Judge Dimitri.

8. There were no open court proceedings that led to the entry of the October 22, 2003 Order. None of the individual petitioners nor any one from the Journal or WLNE was aware of or present at the chambers conferences when the Motion was presented and when the October 22, 2003 Order was entered.

9. Prior to the entry of the October 22, 2003 Order, petitioners were not given an opportunity to argue to the court why the Order should not be entered and/or applied to them.

10. Aside from the single copy of the October 22, 2003 Order provided to Gendron, Judge Dimitri's designated clerk did not reproduce the October 22, 2003 Order or provide anyone with a copy(ies) of the same:

11. Copies of the October 22, 2003 Order were distributed by Judge Dimitri on or about October 30, 2003, to some members of the media who were informally assembled in Judge Dimitri's courtroom.

The distribution of the October 22, 2003 Order did not take place during a court session, but rather took place off the record and while Judge Dimitri was not on the bench. Neither Guarino nor Baxter was present nor did they receive a copy of the October 22, 2003 Order at that time. At least one reporter covering the trial on behalf of WLNE received a copy of the October 22, 2003 Order from Judge Dimitri, but did not forward the October 22, 2003 Order to Guarino or Baxter or advise them of the October 22, 2003 Order. Davis was present when copies of the October 22, 2003 Order were distributed by Judge Dimitri but did not receive a copy.

12. The courtroom was open to the public and to the media with cameras when the trial started on October 30, 2003. At no time during the course of the trial, up through November 5, 2003, did Judge Dimitri orally order petitioners or any other media representatives to refrain from engaging in the activities identified in the October 22, 2003 Order, nor was the October 22, 2003 Order or its content referenced in any way on the record, in open court, by Judge Dimitri, the prosecutors, or defense counsel through November 5, 2003.

13. Subsequent to the entry of the October 22, 2003 Order, and up through November 5, 2003, petitioners did not argue to the court why the Order should not apply to them. During that time, neither Guarino nor Baxter were aware of the existence of the October 22, 2003 Order.

14. On November 6, 2003, Judge Dimitri prohibited any further camera coverage of the trial.

ENTERED as an Order of this Court on the 8th day of Sept., 2004.